**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

DONNA R. BATCHELOR,

> Plaintiff,

v.                                                    Case No. 6:11-cv-1071-Orl-37GJK

GEICO CASUALTY COMPANY,

> Defendant.

---

**ORDER**

This cause is before the Court on the following:

1.    Plaintiff's Motion for Partial Summary Judgment as to the Defendant's First,
      Fifth, Sixth and Seventh Affirmative Defenses (Doc. 121), filed September
      24, 2014;

2.    Geico's Response in Opposition to Plaintiff's Motion for Partial Summary
      Judgment (Doc. 123), filed October 21, 2014;

3.    Plaintiff's Reply to Defendant's Response in Opposition to Plaintiff's Motion
      for Partial Summary Judgment (Doc. 125), filed November 4, 2014;

4.    Geico Casualty Company's Motion for Summary Judgment and
      Incorporated Memorandum of Law (Doc. 122), filed September 25, 2014;

5.    Plaintiff's Response in Opposition to Geico's Motion for Summary Judgment
      (Doc. 124), filed October 23, 2014; and

6.    Geico's Reply to Plaintiff's Response in Opposition to Geico's Motion for
      Summary Judgment (Doc. 126), filed November 5, 2014.

**BACKGROUND**

This action concerns whether Geico Casualty Company ("Geico") violated § 624.155(1)(b)(1), Florida Statutes, by failing "to attempt in good faith to settle" Donna R. Batchelor's ("Plaintiff") claim for uninsured motorist ("UM") benefits ("Claim") arising from an auto accident on March 5, 2005 ("Accident"). (*See* Docs. 67, 70.) A jury trial of the action is set for January 2015 (Doc. 37); but Geico contends that the trial is unnecessary because undisputed facts establish that, as a matter of law, it did not violate § 624.155(1)(b)(1). (*See* Doc. 122, pp. 17–25.) Plaintiff disagrees (*see* Doc. 124), and also contends that Geico should not present four of its "affirmative defenses" at trial because they fail as a matter of law (*see* Doc. 121). For the reasons set forth below, the Court finds that a jury trial is necessary, and the parties' Motions are due to be denied.

## I. The Policy

When the Accident occurred in 2005, Plaintiff was Geico's insured under standard form Florida family automobile policy number 1297-86-40-6 (the "Policy"). (Doc. 70, ¶ 5.) As such, Plaintiff was entitled to personal injury benefits of up to $10,000 ("PIP Limit"),[1] and UM benefits of up to $30,000 ("UM Limits") in "damages for ***bodily injury***" that Plaintiff "is legally entitled to recover from the owner or operator of an ***uninsured auto*** arising out of the ownership, maintenance or use of that auto."[2] (*See* Doc. 130-1, pp. 2, 9–11, 14, 20–25.) Plaintiff was required to provide Geico with "notice" and "written proof"

---

[1] The PIP coverage required Geico to pay 80% of Plaintiff's "medical expenses" for bodily injury resulting from an accident until the PIP Limit was met. (*See* Doc. 130-1, pp. 2, 14–15; *see also* Doc. 122-8.)

[2] An "[u]ninsured auto" is an automobile "for which the total of all bodily injury liability insurance available in the event of an accident is less than the damages sustained in an accident by an insured." (Doc. 130-1, p. 20.)

of her Claim "under oath" if required by Geico. (*See id.* at 16, 22.) Geico also could require Plaintiff to submit to examination: (1) "by doctors chosen by" Geico at Geico's expense (*id.*); and (2) "under oath by any person named by [Geico] when and as often as [Geico] may reasonably require." (*Id.* at 16, 22, 24.)

For purposes of UM benefits, damages exclude "pain, suffering, mental anguish, or inconvenience" unless Plaintiff's "***bodily injury*** consists in whole or in part of: (a) significant and permanent loss of an important bodily function; or (b) permanent injury within a reasonable degree of medical probability."[3] (*See id.* at 3.) Further, no UM benefits were due from Geico "until the total of all bodily injury liability insurance available has been exhausted by payment of judgments or settlements," and UM benefits could not duplicate "any amount paid or payable: (a) under any motor vehicle liability insurance coverages; or (b) by or on behalf of the owner or operator of the uninsured motor vehicle." (*Id.* at 21.) Finally, Geico was "entitled to repayment" of UM benefit payments from any funds Plaintiff might receive from an uninsured tortfeasor (*id.*), and Plaintiff was required to seek written consent from Geico before she could settle with an uninsured tortfeasor. (*See id.* at 21–22 (requiring submission of settlement agreement to Geico if an insured "intends to pursue" a UM claim against Geico).)

## II.   Accidents and Injuries

The Accident occurred on Highway 192 in Brevard County, Florida, when Lou Ann Arnold ("Arnold") struck the front passenger side of an insured vehicle operated by Plaintiff. (*See* Doc. 122-2; Doc. 122-22, pp. 8–16.) The Florida Highway Patrol responded

---

[3] This Policy language mirrors a provision of Florida's uninsured motorist statute. *See* Fla. Stat. § 627.737(2).

and cited Arnold for violating § 316.125, Florida Statutes. (Doc. 122-2; Doc. 122-7, pp. 14–16.) Plaintiff's vehicle was towed away, and due to its age and the collision damage, it was totaled. (*See* Doc. 122-22, pp. 12–14; *see also* Doc. 122-4, pp. 12–13.) Neither Plaintiff nor any of the occupants of her vehicle (her parents, two minor sons, and minor niece) reported physical injuries at the scene of the Accident. (*See* Doc. 122-2, p. 2; *see also* Doc. 122-22, pp. 8–10.)

Soon after the Accident, Plaintiff experienced pain in her lower back, and in April 2005, she sought treatment from chiropractor Matthew Boucher, D.C. (*See* Doc. 122-22, pp. 15–20; *see also* Doc. 122-4, p. 7; 122-7, pp. 17–30.) On April 19, 2005, a magnetic resonance imaging study of Plaintiff's lumbar spine was done ("First MRI"). Radiologist Jeffrey S. Araj reported that the First MRI showed two disc herniations—a "[s]mall left-sided disc herniation at the L5-S1 intervertebral disc space level" and a "[v]ery small central disc herniation at the L4-L5 intervertebral disc space level" ("Araj Report"). (*See* Doc. 122-7, pp. 3, 31; *see also* Doc. 122-4, pp. 5, 3.)

Plaintiff did not find Dr. Boucher's treatments helpful (Doc. 122-22, pp. 23–24), so she sought evaluation and treatment from neurologist Gary M. Weiss, M.D. (Doc. 122-7, pp. 41–43.) Based on his examination of Plaintiff, the First MRI, and an EMG Nerve Conduction Study ("EMG Study"), Dr. Weiss concluded that Plaintiff suffered from "[h]erniated nucleus pulposus L5-S1 greater than L4-5 with bilaterial S1 radicular symptoms." (*See* Doc. 122-7, p. 46; *see also id.* at 44–51.) Dr. Weiss prescribed various treatments for Plaintiff's low back pain, including massage, pilates, VAX-D, use of a back brace, and various pain, anti-inflammatory, and muscle relaxing medications. (*See* Doc. 122-22, pp. 24–28, 41–43; Doc. 122-23, p. 7; *see also* Doc. 122-26.)

4

On October 14, 2005, Plaintiff was involved in another car accident ("Second Accident"),[4] and she underwent a thoracic MRI less than twelve days later ("Second MRI"). (*See* Doc. 122-21, p. 2; *see also* Doc. 122-3, p. 3.) After the Second MRI, Dr. Weiss concluded that Plaintiff suffered from "[h]erniated nucleus pulposus T7-8 and T8-9 with bulging T9-10" and aggravation of "low back pain with herniated nucleus pulposus L5-S1 and bulging L4-5 with right greater than left radiculopathy." (*See* Doc. 122-21, p. 2; *see also* Doc. 122-3, p. 3.) Plaintiff continued various treatments, but experienced little relief.[5] (*See* Docs. 121-12, 121-13, 122-26; *see also* Doc. 122-22, pp. 24–28, 41–43.)

In June 2006, Plaintiff was examined and treated by neurosurgeon Charles Theofilos, M.D., who diagnosed Plaintiff "with lumbar disc radiculopathy." (Doc. 122-24, p. 4; Doc. 122-31, p. 4.) Dr. Theofilos advised Plaintiff that her more aggressive treatment options included transforaminal epidural injections, a discogram, nucleoplasty, intradiscal decompression therapy (IDD), and microdiskectomy. (*See* Doc. 122-24, pp. 4–6.) Plaintiff ultimately underwent a provocative diskogram, IDD, epidural injections, and other invasive treatments to alleviate her pain. (*See* Doc. 121, p. 2; Doc. 122-31, p. 4; *see also* Doc. 122, pp. 11–12; Doc. 122-32, p. 13.)

### III.   Claims Handling

Plaintiff provided Geico with notice from the scene of the Accident, and Geico first documented the Claim at 1:41 p.m. on March 5, 2004. (*See* Doc. 122-4, p. 18.) On that

---

[4] Due to the Second Accident, Plaintiff submitted additional claims to Geico for PIP and UM benefits ("Second Claim"). (*See* Doc. 122-4, p. 1; Doc. 122-5, p. 15; *see also* Doc. 122-22, pp. 28, 31–32, 37–41.) On November 30, 2007, Plaintiff and Geico agreed to settle the Second Claim for UM Limits. (*See* Docs. 122-31, 122-34, 122-35; *see also* Doc. 122, p. 12.)

[5] On April 5, 2006, Geico advised Plaintiff that she had exhausted the PIP Limits for her medical expenses. (*See* Doc. 122, p. 9; Doc. 122-3, p. 12; *see also infra* n.1.)

day, Geico noted the phone numbers for Windsor Insurance Company ("Windsor"), which insured Arnold with a policy that provided liability coverage of up to $10,000 ("Arnold Limits"). (*See id.* at 13, 17–18; *see also* Doc. 122-7.) Geico also noted that no injuries were reported. (*See* Doc. 122-4, pp. 17–18.) Geico then documented little activity concerning the Claim until April 12, 2005, when: (1) Plaintiff contacted Geico to advise it of her back pain and her need for medical treatment (*see* Doc. 122-4, pp. 16–18; *see also* Doc. 121-1, p. 2); and (2) Geico recorded its interview of Plaintiff (*see* Doc. 122-5).

Geico's records indicate that by June 2005, it was advised that Plaintiff suffered a herniated disc, it had not found any motor vehicle accident or workers compensation claims that might indicate that Plaintiff's back issue pre-dated the Accident, and it was monitoring the file for UM exposure. (*See* Doc. 122-4, pp. 11–12; Doc. 124-1, pp. 31–32; *see also* Doc. 122, p. 3; Doc. 124-1, pp. 19–21, 24 (testifying that Geico may have received the Araj Report on April 26, 2005).)

On July 1, 2005, Geico received a copy of correspondence to Windsor from Plaintiff's attorney, which conveyed offers to settle for the Arnold Limits and to accept Geico's UM Limits if Geico tendered within thirty days. (*See* Doc. 122-7 ("Arnold Offer"); *see also* Doc. 124-1, pp. 37–38; Doc. 124-2, p. 12.) In the Arnold Offer, Plaintiff: (1) represented that she had sustained "permanent physical injuries" as a result of the Accident which would probably require future surgical intervention; (2) provided documentation of her "ongoing medical treatment" and bills reflecting more than $8,000 in medical expenses between April 13, 2005 and May 17, 2005; and (3) estimated that the value of her claim against Arnold was at least $272,957.92. (*See* Doc. 122-27, pp. 3, 4, 6.) In a response dated July 11, 2005 ("Arnold Response"), Geico characterized

Plaintiff's injury as soft tissue "at best," and advised that: (1) Geico was not "in a position to offer a UM settlement;" but (2) it would "re-evaluate" the Claim if Windsor tendered the Arnold Limits.[6] (*See* Doc. 122-8.)

After Windsor tendered the Arnold Limits on July 19, 2005, Plaintiff asked Geico to: (1) approve her settlement with Windsor; (2) waive Geico's subrogation rights or pay the Arnold Limits to Plaintiff; and (3) tender the UM Limits. (*See* Doc. 122-9 ("July Offer").) Plaintiff represented that her "injuries warrant evaluation" of her Claim in excess of UM Limits and warned that she would file a complaint for violation of § 624.155 if Geico did not tender the UM Limits immediately. (*Id.*) On August 3, 2005, Plaintiff's counsel further advised Geico that Plaintiff was being referred as a "surgical candidate." (*See* Doc. 121-1, p. 1; Doc. 124-3, pp. 13–14.)

In its August 8, 2005 response to the July Offer, Geico did not reference Plaintiff's demand for UM Limits; however, it did advise that it would pay the Arnold Limits to Plaintiff in order "to retain [Geico's] rights of subrogation."[7] (Doc. 122-10 ("July Response").) Geico also requested additional information from Plaintiff to "continue the evaluation" of her Claim, including income support documentation and medical records. (*Id.*)

---

[6] Geico's records reflect that several days before the Arnold Response, its claims examiner had evaluated the Claim as follows: (1) Plaintiff was 31 years old, 5' 1" and 192 pounds; (2) Plaintiff did not seek medical treatment for over a month after the Accident; (3) no "impingement" was detected in Plaintiff's scans despite the diagnosis of S1 nerve root radiculopathy; (4) Plaintiff's out-of-pocket medical expenses totaled only $1,750.05 after Geico's 80% PIP payments; (5) the Arnold Limits were sufficient to compensate Plaintiff; and (6) Geico should offer Plaintiff $2,500.00 in the "[s]pirit of [c]ompromise." (*See* Doc. 122-4, p. 7; *see also* Doc. 124-1, pp. 39–42; Doc. 124-5, pp. 12–14.) Geico did not deviate from its $2,500.00 offer until November 28, 2007. (*See* Docs. 121-10, 122-17, 122-28, 122-33.)

[7] The Policy provides that Plaintiff may file an action against Geico if Geico fails to waive its subrogation rights and approve a settlement "within 30 days after receipt of the settlement agreement." (*See* Doc. 130-1, pp. 21–22.)

Two days after receipt of the August Response—on August 10, 2005—Plaintiff submitted a civil remedy notice ("CRN") to the Florida Department of Insurance ("DOI"), complaining that Geico had made no offer to settle the Claim despite Plaintiff's "reasonable settlement offer for payment of policy limits" ("First CRN"). (*See* Doc. 121-5; *see also* Doc. 67-3, pp. 1–5, 6–10; Doc. 122-11.) In correspondence dated August 17, 2005, Geico acknowledged receipt of the First CRN and advised that it would reevaluate the Claim once it received "additional information" ("August Response"). (*See* Docs. 121-6, 122-12.)

On August 29, 2005, Plaintiff provided Geico with additional medical records from Dr. Weiss and proof that Windsor had tendered the Arnold Limits. (*See* Docs. 122-13, 122-14.) Plaintiff advised Geico that she had no other medical records due to her previous "good health," and income support documentation did not exist because Plaintiff "was a full-time homemaker." (*See* Doc. 122-13.) Finally, Plaintiff offered to obtain a copy of the First MRI for Geico upon receipt of a check for the cost of the copy. (*Id.*) Geico responded that it would "be in contact . . . to discuss resolution" of the Claim after it received a copy of the First MRI. (Doc. 122-15.) Plaintiff then provided Geico with a copy of the First MRI, which Geico provided to Michael M. Raskin, M.D., F.A.C.R. for analysis. In a report dated September 16, 2005, Dr. Raskin advised Geico that the First MRI showed only "mild bulging of the L4-5 and L5-S1 discs without evidence of disc herniation or nerve root impingement." (Doc. 122-16 ("Raskin Report").)

On September 23, 2005, Geico provided the Raskin Report to Plaintiff with an offer to resolve the Claim for $2,500.00 ("Geico's First Offer"). (*See* Doc. 122-17.) Plaintiff did not accept Geico's First Offer; rather, on October 24, 2005, Plaintiff submitted another

CRN to the DOI complaining that Geico responded to her "reasonable settlement offer" with an offer of "only $2,500.00" ("Second CRN"). (*See* Docs. 122-18.) Geico responded by reiterating its $2,500.00 offer ("Geico's Second Offer"), which Plaintiff rejected. (*See* Docs. 121-10, 122-19.)

## IV.    Coverage Action

Less than two months after receipt of Geico's Second Offer—on December 29, 2005—Plaintiff and her spouse, Shawn R. Batchelor, filed a coverage action against Geico in state court ("Coverage Action"). (*See* Docs. 121-11, 122-20.) Thereafter, Geico did not initiate or participate in settlement discussions with Plaintiff until September 2007, when it responded to Plaintiff's settlement offer of $450,000.00 by again offering Plaintiff $2,500.00—which was to be apportioned $2,400.00 to Plaintiff and $100.00 to her spouse. (*See* Docs. 122-28, 122-29; *see also* Doc. 122-32, pp. 9–12.) After Plaintiff rejected the $2,500.00 offer, Geico finally tendered the UM Limits to Plaintiff on November 28, 2007, which Plaintiff rejected. (*See* Doc 122-33.) Plaintiff also rejected Geico's subsequent proposal to settle for $30,000.00. (*See* Doc. 122-36.)

While the Coverage Action was pending, Geico obtained a surveillance report of Plaintiff in January 2007 and a supplemental report from Dr. Raskin in August 2007 ("Supplemental Report").[8] (*See* Doc. 122-3; Doc. 122-25; Doc. 122-27; *see also* Doc. 124-7, pp. 28–29.) In December 2007, Geico also required Plaintiff to submit to an independent medical examination by orthopedic surgeon, Dr. Joseph Urrichio.

---

[8] The Supplemental Report set forth a "new finding" that "there is now narrowing of the L5-S1 disc space with desiccation of the disc and a left central disc herniation." (Doc. 122-27 (noting his agreement with Dr. Weiss, who identified two small herniations as well as disc bulge in the mid thoracic spine).)

(*See* Doc. 122, p. 11; Doc. 122-3, pp. 2–3; *see also* Doc. 130-1, pp. 16, 22, 24.)

Due to several delays, the parties did not have their jury trial in the Coverage Action until April 2011. (*See* Doc. 121-15; *see also* Doc. 122-32, pp. 14–16.) The jury returned a verdict in Plaintiff's favor finding that she sustained "a permanent injury within a reasonable degree of medical probability" as a result of the Accident. (*See* Doc. 121-16, pp. 1–3.) The jury also found that Plaintiff suffered $1,792,674.84 in damages, which was comprised of: (1) $350,496.84 for past medical expenses; (2) $642,178.00 for future medical expenses; and (3) $800,000 for pain and suffering. (*See id.* ("Excess Verdict").) On Geico's motion, the state trial court did not enter judgment for the amount of the Excess Verdict; rather, the state court entered final judgment in Plaintiff's favor in the amount of the UM Limits—$30,000.00 ("Judgment"). (Doc. 121-16, pp. 4–5.) Geico appealed the Judgment, and the state appellate court affirmed *per curiam*. *See Geico Cas. Co. v. Batchelor*, 111 So. 3d 895 (Fla. 5th DCA 2013).

## V.    Bad Faith Claim

After Plaintiff obtained the Excess Verdict, she amended her Complaint to assert a claim against Geico for violation of § 624.155(1)(b)(1). (Docs. 17-2, 17-3.) Geico then filed a notice of removal with this Court on June 28, 2011 (Doc. 1), and the Court entered a stay that was lifted on July 8, 2013—after Geico exhausted its appeals in the Coverage Action. (*See* Docs. 21, 33.) On February 11, 2014, Plaintiff filed a Second Amended Complaint. (Doc. 67.) Geico then filed its Answer and asserted seven "affirmative defenses." (*See* Doc. 70, ¶¶ 20–26.) Contentious discovery ensued requiring repeated intervention by the Court.[9] In a discovery Order dated June 9, 2014, the Court held that

_____

[9] (*See* Doc. 72 (granting motion to compel interrogatory responses); Doc. 80

10

Geico was not entitled to discovery concerning Plaintiff's damages because her "damages were fixed" by the Excess Verdict. (*See* Doc. 109.)

In September 2014, Plaintiff and Geico both filed motions for summary judgment. (Docs. 121, 122.) The parties filed their Responses in October (Docs. 123, 124) and their Replies in November (Docs. 125, 126). These matters are now ripe for adjudication.

**STANDARDS**

**I.      Summary Judgment**

Pursuant to Federal Rule of Civil Procedure 56(a), a party may file a motion "identifying [the] claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). To prevail, the movant must establish that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." *Id.*; *see Swaebe v. Fed. Ins. Co.*, 374 F. App'x 855, 856 (11th Cir. 2010); *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000). Assertions that a fact cannot be "genuinely disputed" must be supported by citations "to particular parts of materials in the record." *See* Fed. R. Civ. P. 56(c)(1)(A).

An adequately supported motion under Rule 56(a) shifts the burden "'to the non-moving party to show that specific facts exist that raise a genuine issue for trial.'" *Stephens v. Mid-Continent Cas. Co.*, 749 F.3d 1318, 1321 (11th Cir. 2014) (quoting *Dietz v. Smithkline Beecham Corp.*, 598 F.3d 812, 815 (11th Cir. 2010)). A genuine issue for trial exists if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see*

---

(granting motion to compel production of documents); Docs. 94, 108 (granting in part motions to compel); *see also* Docs. 113, 116 (overruling objections to orders compelling the production of documents).)

*Flamingo S. Beach Condo. Ass'n, Inc. v. Selective Ins. Co. of SE*, 492 F. App'x 16, 26 (11th Cir. 2012). The Court must believe the "evidence of the non-movant" and must draw "all justifiable inferences" in the non-movant's favor. *See Anderson*, 477 U.S. at 256; *see also Delancy v. St. Paul Fire & Marine Ins. Co.*, 947 F.2d 1536, 1544 (11th Cir. 1991).

## II.    Florida's Bad Faith Statute[10]

A Florida insured may assert a statutory cause of action for first party bad faith against her insurer if the insured is "damaged" by her insurer's failure to attempt "in good faith to settle claims when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for her . . . interests."[11]  Fla. Stat. § 624.155(1)(b)(1); *see Macola v. Gov't Emps. Ins. Co.*, 953 So. 2d 451, 456 (Fla. 2006).  An insured may bring such an action only if her insurer fails to pay her claim, or correct the circumstances giving rise to the claim, within 60 days after the insured submits a CRN. *See* Fla. Stat. §§ 624.155(3)(a) & (3)(d). This 60 day "window" provides insurers with a final opportunity "to comply with their claim-handling obligations when a good-faith decision by the insurer would indicate that contractual benefits are owed." *See Talat Enters., Inc. v. Aetna Cas. & Sur. Co.*, 753 So. 2d 1278, 1283 (Fla. 2000); *see also Vest v. Travelers Ins. Co.*, 753 So. 2d 1270, 1275 (Fla. 2000)

---

[10] The "so-called 'Bad Faith Statute'" was enacted in 1982 "to provide a civil remedy for any person damaged by an insurer's conduct." *QBE Ins. Corp. v. Chalfonte Condo. Apartment Ass'n, Inc.*, 94 So. 3d 541, 546 (Fla. 2012) (internal quotation marks omitted).

[11] In applying Florida law, the Court looks "first for case precedent from the Florida Supreme Court." *Composite Structures, Inc. v. Cont'l Ins. Co.*, 560 F. App'x 861, 864 (11th Cir. 2014) (internal quotation marks omitted). Absent such precedent, the Court is "bound to adhere to decisions of [Florida's] intermediate appellate courts" unless a persuasive indication exists that the Florida Supreme Court "would decide the issue otherwise." *Id.*

(holding that an "appropriate response" to a CRN must be "based upon the insurer's good-faith evaluation of what is owed on the insurance contract").

"The question of bad faith extends to the insurer's 'entire conduct in the handling of the claim'" *Kafie v. Nw. Mut. Life Ins. Co.*, 834 F. Supp. 2d 1354, 1359 (S.D. Fla. 2011) (quoting *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 680 (Fla. 2004)), and liability turns on the fact-intensive, totality of the circumstances standard. *See Berges*, 896 So. 2d at 680. Florida law requires that insurers "investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person faced with the prospect of paying the total recovery would do so." *Boston Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783, 785 (Fla. 1980). "'[B]ad faith may be inferred from a delay in settlement negotiations which is willful and without reasonable cause.'" *Jaimes v. GEICO Gen. Ins. Co.*, 534 F. App'x 860, 865–66 (11th Cir. 2013) (quoting *Powell v. Prudential Prop. & Cas. Ins. Co.*, 584 So. 2d 12, 14 (Fla. 3d DCA 1991)).

Because compliance with § 624.155(1)(b)(1) "'involves diligence and care in the investigation and evaluation of the claim,'" an insurer's negligence is relevant to the inquiry—although not sufficient for a finding of bad faith. *See Dadeland Depot, Inc. v. St. Paul Fire & Marine Ins. Co.*, 483 F.3d 1265, 1276 (11th Cir. 2007) (quoting *Boston Old Colony Ins.*, 386 So. 2d at 785); *see also King v. Gov't Emps. Ins. Co.*, 579 F. App'x 796, 804 (11th Cir. 2014) (including "the negligence of the insurer" as a circumstance that may be considered in determining whether an insurer has "breached its duty to negotiate in good faith"); *Jaimes*, 534 F. App'x at 866 (quoting *Campbell v. Gov't Emps. Ins. Co.*, 306 So. 2d 525, 530–31 (Fla. 1974)).

## DISCUSSION

**I.    Geico's Motion**

Geico argues that the Court should rule in its favor based on the following facts,

which Geico contends demonstrate as a matter of law that it had a "reasonable basis" for

its $2,500.00 settlement offer when it received the Second CRN:

> When Geico was initially presented with the demand[, the Claim] presented significant issues regarding whether or not the injuries [Plaintiff] claimed were actually caused by [the Accident]. The record shows that at the time of the Accident, [Plaintiff] was overweight and failed to report her injuries to Geico or seek treatment for over a month. Moreover, the Accident was low impact with minimal damage to the vehicles involved. When [Plaintiff] finally sought treatment, she began conservative modalities with a chiropractor. [The First MRI] revealed only "small" and "very small" herniations according to [the Araj Report]. In addition, her complaints of radiculopathy conflicted with the diagnostic studies that showed no nerve root impingement. The medical bills enclosed with [the Arnold Offer] evidenced that . . . 80% of [Plaintiff's] bills [were paid with PIP benefits], and that [she] only paid $1,705.05 out-of-pocket. While [Plaintiff] had visited a neurologist, he had not recommended anything other than continued conservative care. Moreover, none of the records provided to Geico evidence that [Plaintiff] suffered from a permanent injury. Thus, under the totality of the circumstances, considering the significant questions as to causation and damages, it was reasonable for Geico to evaluate [the Claim] as being a soft tissue injury, valued within $20,000 combined [Arnold Limits] and PIP limits.

(*See* Doc. 122, pp. 20–21 (asserting that "there was no indication that [Plaintiff] was a

surgical candidate").)   Geico further asserts that its September 2007 tender of the UM

Limits was consistent with its obligations under Florida law.[12] (*Id.*)

---

[12] Like most of Geico's factual assertions, the evidentiary support for this assertion is ambiguous at best. Geico's attorney in the State Action did attribute Geico's decision to tender the UM Limits to "the new information provided in the November 14 update deposition of [Plaintiff] and the November 20 deposition of Thomas McGee, MD" (*see* Doc. 122-32, pp. 14–16); however, Geico did not document and could not identify who authorized the tender (*See* Doc. 124-5, pp. 19–21; Doc. 124-7, pp. 52–54.) Further, Geico could not explain why it made a settlement offer of $2,500.00 in 2007 even though it had other new information confirming the severity of Plaintiff's injury. (*See* Doc. 124-7,

Geico's argument is devoid of citations to record evidence, and for this reason alone, its Motion fails. *See* Fed. R. Civ. P. 56(c)(1)(A) (requiring that a moving party support its assertions with citations "to particular parts of materials in the record"). Even if Geico had provided sufficient record citations, its Motion still fails because the Court finds ample evidence in the record permitting jury findings that: (1) the Accident was *not* low impact with minimal damage to the vehicles involved; (2) Plaintiff's complaints of radiculopathy did *not* conflict with the diagnostic studies;[13] (3) Dr. Weiss' treatment recommendations were *not* limited to continued conservative care;[14] (4) the medical records provided to Geico demonstrated that Plaintiff suffered a permanent injury; and (5) Geico was *not* presented with significant issues concerning causation.

First, Plaintiff's deposition testimony contradicts Geico's description of the Accident as low impact, and the evidence concerning the damage to Plaintiff's car—it had to be towed from the scene of the Accident and was considered a total loss—does not support Geico's assertions. (*See* Doc. 122-22, pp. 7–15.) Further, there is no evidence in the record concerning the condition of Arnold's vehicle after the Accident. Accordingly, questions of fact exist concerning whether Geico's purported assessment of the severity of the Accident was in good faith and provided support for Geico's claims handling decisions.

---

pp. 26--27, 33–34; *see also* Doc. 124-5, pp. 9–12; Doc. 124-7, pp. 36–37.)

[13] The only evidence supporting this assertion came from one of Geico's claims examiners, and she conceded that the EMG Study showed "radiculopathy." (Doc. 124-4, pp. 19–20, 26, 31, 33.) The purported "conflict" related to the claims examiner's reading of the First MRI and Plaintiff's purported report of left-sided pain while the EMG Study showed "right-sided complaints on the nerve conduction." (*Id.* at 33.)

[14] The medical records reflect only Plaintiff's initial preference for "conservative treatment." (*See* Doc. 122-26.)

Questions of fact also exist concerning Geico's assessment of Plaintiff's injury. For instance, a jury could find that the testimony of Geico's claims examiners reflect an understanding that Plaintiff's injury was permanent. (*See* Doc. 124-4, p. 31 (conceding that "doctors rated" Plaintiff with a permanent injury, so she had a "permanency"); *see also* Doc. 124-1, p. 45 (conceding that, in Florida, a "herniated disc" would be "sufficient to satisfy the permanent injury threshold"); Doc. 124-2, pp. 14–15 (testifying that Geico would consider a herniated disc a "significant injury" if "impingement" or "radicular symptoms" are noted); *but see* Doc. 124-8, pp. 15–16.) Further, Geico notes that its assessment of Plaintiff's medical condition was based, in part, on Plaintiff's delay in seeking medical treatment; however, the initial claims examiner testified that Plainitff's delay did not have a "significant impact" on her evaluation. (*See* Doc. 124-1, pp. 44–45.) Although another Geico employee referenced the treatment delay as one of his reasons for believing that Geico handled the Claim in good faith, such conflicting testimony does not establish a "fact" as a matter of law. (*See* Doc. 124-5, pp. 12–13, 22–23.)

With respect to causation, Geico's claims examiner conceded that she never had "any indication that [Plaintiff's] back injuries were caused by anything other than" the Accident. (*See* Doc. 124-4, pp. 27, 32 (stating that Plaintiff's "injury was caused by" the Accident).) Further, despite investigative efforts, Geico obtained no records indicating that Plaintiff had complained of lumbar back pain before the Accident. (*See* Doc. 124-4, pp. 25–27; Doc. 124-8, p. 11; *see also* Doc. 125-7, pp. 31–32 (testifying that Geico did a "hospital canvas" and "pharmacy canvas" to "see if there is any prior activity by Plaintiff indicating her back complaints existed prior to the Accident).) In light of this evidence, testimony from a Geico employee who claimed that Dr. Raskin advised Geico that

Plaintiff's back injuries "appeared degenerative" is insufficient to establish, as a matter of law, that Geico was faced with "significant issues" concerning causation.[15] (*See* Doc. 124-5, pp. 13–14.)

The record reflects sufficient additional evidence that would permit a jury to conclude that Geico failed to attempt "in good faith to settle" the Claim when "it could and should have done so" in the Fall of 2005, had it "acted fairly and honestly" and with "due regard" for Plaintiff's interests. *See* Fla. Stat. § 624.155(1)(b)(1). For instance, the evidence indicates that Plaintiff was willing to settle for UM Limits from the time of the Arnold Offer in 2005 until the summer of 2007 (*see* Docs. 121-4, 121-20); yet, Geico's claims adjusters never "picked up the phone" to try and negotiate the Claim with Plaintiff's attorney. (*See* Doc. 124-4, pp. 35, 40; Doc. 124-7, p. 27; Doc. 124-8, p. 19.) Further, a jury could find that a fair and honest investigation of the Claim in the Fall of 2005 would have included an independent medical exam of Plaintiff, an independent review of all of Plaintiff's medical records (not just Dr. Raskin's review of the First MRI in isolation), and an effort to obtain permission from Plaintiff to confer with her treating physicians. Yet, Geico did none of these things before it responded to the Second CRN. (*See* Doc. 124-1, pp. 48–49; *see also* Doc. 124-2, pp. 16– 7; Doc. 124-4, pp. 15–16, 40–41; Doc. 124-8, pp. 12–13, 17.) Indeed, based on Geico's limited investigation and the testimony of its claims examiner that her intent in offering $2,500.00 in the Second Offer was to "get some kind of conversation going," (*see* Doc. 124-2, pp. 30–32), a jury could conclude that

---

[15] The record also includes the sworn affidavit of Plaintiff's proffered expert witness, Susan Kaurman, who opined that Geico's handling of the Claim did not comport with the requirements of § 624.155(1)(b)(1). (*See* Doc. 124-9.) As one example, Ms. Kaufman notes that Geico "placed more weight on" Dr. Raskin's report over the reports of Plaintiff's treating radiologist. (*Id.* ¶ 5.)

Geico's response to the Second CRN was not a "good-faith evaluation" of what it owed Plaintiff on the Policy. *See Vest*, 753 So. 2d at 1275.

Resolution of a statutory bad faith claim "is rarely possible as a matter of law." *Cadle v. Geico Gen. Ins. Co.*, No. 6:13-cv-1591-Orl-31GJK, 2014 WL 4983746, at *3 (M.D. Fla. Oct. 6, 2014) (denying insured's motion for summary judgment due to question of fact concerning whether insurer's claim valuation was in good faith); *King v. Gov't Emps. Ins. Co.*, No. 8:10-cv-977-T-30AEP, 2012 WL 4052271, at *4 (M.D. Fla. Sept. 13, 2012) (same); *Dellavecchia v. Geico Gen. Inc. Co.*, No. 8:09-cv-2175-T-27TGW, 2011 WL 53029, at *2 (M.D. Fla. Jan. 7, 2011) (same); *Kearney v. Auto-Owners Ins. Co.*, 664 F.Supp.2d 1234, 1243 (M.D. Fla. 2009) (same); *see also Vest*, 753 So. 2d at 1275 ("Good-faith or bad-faith decisions depend upon various attendant circumstances and usually are issues of fact to be determined by a fact-finder."). Because the issues concerning an insurer's claims handling decisions are "for the jury," Courts grant motions for summary judgment concerning "bad faith" in rare circumstances. *See Thomas v. Lumbermens Mut. Cas. Co.*, 424 So. 2d 36, 38 (Fla. 3d DCA 1982); *see also Berges*, 896 So. 2d at 680 ("[W]here material issues of fact which would support a jury finding of bad faith remain in dispute, summary judgment is improper."). Such rare circumstances plainly are not presented by this action. Accordingly, Geico's Motion is due to be denied.

## II.    Plaintiff's Motion

Plaintiff requests summary judgment in her favor concerning the following four "affirmative defenses" asserted by Geico (Doc. 121): (1) the Policy did not require Geico to settle ("First Defense"); (2) "Geico did not have a realistic opportunity to settle" within Policy limits ("Fifth Defense"); (3) Plaintiff "was unwilling to settle" within Policy limits

("Sixth Defense"); and (4) Plaintiff failed to allege any recoverable damages because the Excess Verdict "is not an element" of her damages ("Seventh Defense"). (Doc. 70, ¶¶ 20–26.) Geico urges the Court to deny Plaintiff's Motion because "Geico is entitled to summary judgment, not Plaintiff." (*See* Doc. 123, p. 2.) Geico also contends that the Motion is "improper" because Geico's "Seventh Defense" is "no longer subject to dispute." (*See id.* at 2, 10–11.)

Given Geico's concession that "Plaintiff is not required to re-litigate her damages in this bad faith action," and the Excess Verdict "will constitute the measure of damages to be awarded" in this action (if any) (*see id.*), the Court finds that Plaintiff's Motion with regard to the Seventh Defense is due to be denied as moot.

The remainder of Plaintiff's Motion concerns assertions by Geico that are simply "denials" of Plaintiff's allegations in support of its *prima facie* case—*not* true affirmative defenses.[16] *See Cadle*, 2014 WL 793339, at *3; *see also In re Rawson Food Serv., Inc.*, 846 F.2d 1343, 1349 (11th Cir. 1988) ("A defense which points out a defect in the plaintiff's *prima facie* case is not an affirmative defense."). As noted above, the record is replete with material questions of fact concerning Plaintiff's *prima facie* case; thus, Geico's denials are not subject to resolution as a matter of law, and the remainder of Plaintiff's Motion is due to be denied.

---

[16] This action is certainly not the first time Geico's mischaracterization of its denials as affirmative defenses has necessitated unnecessary rulings from the judicial officers of this Court. *See King*, 2012 WL 4052271, at *8 (addressing insured's motion for summary judgment on same "affirmative defense" asserted by Geico); *Dellavecchia*, 2011 WL 53029, at *4 (same). Given these prior rulings, Court is perplexed that Geico continues to assert such matters as affirmative defenses in the bad faith actions filed against it in this Court.

## CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED**:

1. Geico Casualty Company's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 122) is **DENIED**.

2. Plaintiff's Motion for Partial Summary Judgment as to the Defendant's First, Fifth, and Sixth Affirmative Defenses (Doc. 121) is **DENIED**, and Plaintiff's Motion for Partial Summary Judgment as to the Defendant's Seventh Affirmative Defense (Doc. 121) is **DENIED AS MOOT**.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on December 16, 2014.

ROY B. DALTON JR.
United States District Judge

Copies:

Counsel of Record