**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

DONNA R. BATCHELOR,

        Plaintiff,

v.                                      Case No. 6:11-cv-1071-Orl-37GJK

GEICO CASUALTY COMPANY,

        Defendant.

_____

**ORDER**

This cause is before the Court on the following:

1.      Plaintiff's Motion to Vacate Judgment and for Sanctions (Doc. S-218), filed March 3, 2015;

2.      Geico Casualty Company's Response in Opposition to Plaintiff's Motion to Vacate Judgment and for Sanctions (Doc. S-233), filed March 20, 2015;

3.      Plaintiff's Motion for New Trial (Doc. S-220), filed March 3, 2015; and

4.      Geico's Amended Response in Opposition to Plaintiff's Motion for New Trial (Doc. S-237), filed March 23, 2015.

**BACKGROUND**

"Odyssey" is used often to describe legal conflicts that spend years before multiple tribunals—often in diverse jurisdictions—seemingly without end. That word fits here.

On **March 5, 2005**, Donna R. Batchelor—a driver insured by Geico Casualty Company ("**Geico**") under Florida Automobile Policy 1297-86-40-6 ("**Policy**")—was injured in an automobile accident ("**March Accident**"), which was caused by an at-fault driver ("**Driver**"). Police responded; Geico and the Driver's insurer—Windsor Insurance

Company ("**Windsor**")—were notified; and Batchelor demanded compensation. Windsor tendered to Batchelor the maximum available under the liability policy it had issued to the Driver—$10,000.00 ("**Windsor Payment**"). Geico paid some of Batchelor's medical expenses as personal injury benefits ("**PI Payments**"), but it rejected Batchelor's demands for payment of the maximum uninsured motorist benefits—**$30,000.00** ("**UM Limits**").[1] Batchelor retained attorney John Alpizar ("**Alpizar**") and submitted her civil remedy notices ("**CRN**"), but Geico would not pay her demands for the UM Limits. On **December 29, 2005**, Batchelor filed suit against Geico in the Eighteenth Judicial Circuit in and for Brevard County, Florida ("**UM Coverage Action**").[2]

Protracted litigation ensued in the state courts, and Batchelor prevailed convincingly—the jury returned a verdict in her favor for **$1,792,674.84** ("**Excess Verdict**"), which was upheld on appeal.[3] Geico was undeterred. Under Florida law, the Excess Verdict became a Sword of Damocles, which would not fall unless and until

---

[1] Pursuant to Florida Statutes, § 627.727(1), Geico was required to offer uninsured motorist benefits ("**UM Benefits**") as part of the Policy. *See State Farm Mut. Auto. Ins. Co. v. Curran*, 135 So. 3d 1071, 1076–77 (Fla. 2014). By making UM Benefits mandatory, Florida intends to "protect persons who are legally entitled to recover damages for injuries caused by owners or operators" of underinsured vehicles. *Id.* (citing *Flores v. Allstate Ins. Co.*, 819 So. 2d 740, 744 (Fla. 2002)).

[2] In the UM Coverage Action, Batchelor could seek her "total damages" regardless of her UM Limits. *See* Fla. Stat. § 627.727(6) (defining "total damages" as "the full amount of damages determined to have been sustained" by the insured); *see also Woodall v. Travelers Indem. Co.*, 699 So. 2d 1361, 1363–64 (Fla. 1997); *Robinson v. Auto Owners Ins. Co.*, 718 So. 2d 1283, 1285 (Fla. 4th DCA 1998). In turn, Geico—who essentially "stood in the shoes" of the Driver—could defend the UM Coverage Action by asserting any substantive defense available to the Driver. *See Allstate Ins. Co. v. Boynton*, 486 So. 2d 552, 557–58 (Fla. 1986). Ultimately, the judgment entered against Geico in the UM Coverage Action must credit Batchelor for the Windsor and PI Payments, and it could not exceed the UM Limits. *See* Fla. Stat. § 627.727(6)(c). These are just some of the many procedures and rules—peculiar to Florida insurance law—that contributed to the complexity of this dispute. (*See infra* notes 4 & 5.)

[3] *Geico Cas. Co. v. Batchelor*, 111 So. 3d 895 (Fla. 5th DCA 2013).

Batchelor prevailed on *another* claim—that Geico violated Florida Statutes, § 624.155(1)(b)(1) ("**Bad Faith Claim**").[4] Consistent with these unique procedures,[5] after the state trial court entered judgment in the UM Coverage Action, Batchelor promptly initiated her Bad Faith Claim.[6] Geico then removed the action to this Court on **June 28, 2011**, and the Court administratively closed the action to permit exhaustion of Geico's appeals in state court.[7] The case was reopened on **July 8, 2013**, and the parties embarked on a new stage of their odyssey.[8]

Represented by new counsel, the parties maintained their adverse positions with unwavering fervor in this Court.[9] Discovery was contentious and required frequent Court intervention.[10] Significantly, Geico successfully withheld voluminous materials from Batchelor by asserting the attorney-client communication privilege ("**ACCP**") and the work product privilege ("**WPP**").[11]

---

[4] In Florida, the damages recoverable in a bad faith claim under § 624.155(1)(b)(1) include "the total amount of the claimant's damages, *including the amount in excess of the policy limits*," interest, attorney's fees and costs. *See* Fla. Stat., § 627.727(10) (emphasis added); *see also id.* § 627.727(6); *Macola v. Gov't Emps. Ins. Co.*, 953 So. 2d 451, 456 (Fla. 2006). Such damages are recoverable whether they are caused by "an insurer or a third-party tortfeasor." *See* Fla. Stat. § 627.727(10).

[5] Florida law requires that insureds pursue the coverage and bad faith claims successively. *See Blanchard v. State Farm Mut. Auto. Ins. Co.*, 575 So. 2d 1289, 1291 (Fla. 1991) (noting that a bad faith claim does not accrue until an insured prevails on a coverage claim); *see also Dadeland Depot, Inc. v. St. Paul Fire & Marine Ins. Co.*, 945 So. 2d 1216, 1235 (Fla. 2006).

[6] (*See* Doc. 176; Doc. 211, pp. 121–22; Doc. 222, p. 152.)

[7] (*See* Docs. 1, 21.)

[8] (*See* Doc. 33.)

[9] This Court also assumes that the reader is familiar with prior Orders denying the parties' respective motions for summary judgment and resolving various discovery disputes. (*See* Doc. 136; Docs. 80, 94, 108, 109, 113, 116; *see also See* Docs. 21, 50, 158, 161, S-182, S-248.)

[10] (*See* Docs. 72, 76, 80, 94–95, 104, 106–09, 113, 116, 120; *see also* Docs. 53, 55–62, 65, 68–69, 71, 73–75, 77, 79, 84–90, 92, 96–103, 110–12, 114–15, 117–19.)

[11] (*See* Docs. 108, 116; *see also* Doc. 77-2, p. 2; Doc. 77-3, pp. 10–11; Docs. 84,

A jury trial occurred over three days in **January 2015** ("**Trial**").[12] In those three days, much occurred:

- ➢ The Court admitted hundreds of documents in evidence.[13]

- ➢ Ten witnesses testified—including two expert witnesses and the attorneys who represented both parties in the UM Coverage Action.

- ➢ The Court found that the testimony of Geico's UM Coverage Action attorney—Patrick J. Formella ("**Formella**")—resulted in a complete waiver of ACCP concerning his work on the UM Coverage Action and Batchelor's claim for UM Benefits ("**Waived Documents**").

- ➢ The Court instructed the jury to entirely disregard Formella's testimony.[14]

- ➢ The Court ordered Geico to produce the Waived Documents to the Court for *in camera* review after Trial.[15]

- ➢ Batchelor requested a mistrial—which the Court denied.[16]

- ➢ Finally, the jury returned a verdict in favor of Geico ("**Verdict**").[17]

After trial, the Court entered judgment in accordance with the Verdict,[18] and the parties commenced excessive and vitriolic post-trial briefing.[19] The Court held a hearing

---

90, 110, 111.)

[12] (*See* Docs. 162, 163, 166; *see also* Docs. 185, 186, S-194, 200, 201, 211, 222, 223 (providing trial transcripts).)

[13] (*See* Docs. 171–73.)

[14] (*See* Docs. 167, 168.)

[15] (*See* Doc. S-182, *see also* Docs. 189, 190, 195–99, 221.)

[16] (*See* Doc. 170.)

[17] The verdict form posed the question of whether Plaintiff had proved "by a preponderance of the evidence" that Geico "acted in bad faith" in handling Batchelor's claim for UM Benefits. (*See* Doc. 177.) The jury responded "No." (*Id.*)

[18] (*See* Doc. 181 ("**Judgment**").)

[19] (*See* Docs. S-218; S-220; S-233; S-237; *see also, e.g.* Docs. 203, 204, 209, 210, 225–231, S-232, S-234, S-235, 236, S-237, 238–40, S-241, 242–45, S-246, 249–255, S-256, S-257, 258, S-260, S-261, 262–63.)

on July 7, 2015 ("**Hearing**"), and took Batchelor's "Motion for New Trial" and "Motion to Vacate Judgment and for Sanctions" ("**Post-Trial Motions**") under advisement.

After thorough analysis and exhaustive consideration of the record in light of applicable law, the Court concludes with regret that retrial is required.[20] This difficult decision is largely dictated by the Court's determination at Trial that Geico waived ACCP ("**Waiver Decision**"). The Court's *in camera* inspection of the Waived Documents and further consideration of the applicable law validate the Waiver Decision and support additional findings that: (1) Geico's selective waiver at Trial deprived Batchelor of significant evidentiary material necessary to present her case through effective examination of Geico's employees, and through impeachment, cross-examination of Formella, and possible rebuttal; (2) Batchelor's counsel could not fairly be expected to repair the damage to her case by cross-examining Formella after an expedited review of the Waived Documents; (3) the Court's instruction to the jury to disregard Formella's testimony did not adequately address the prejudice to Batchelor's case; and (4) the Court should have granted Batchelor's requests for mistrial. Accordingly, Batchelor's Motion for New Trial is due to be granted.

At uncharacteristic length,[21] below the Court has summarized: (1) the pre-trial

---

[20] The Court endeavors to be a diligent custodian of the litigants' right to a jury trial, and maintains enduring respect for the efforts and sacrifices of every juror called to serve by this Court. Thus, it is a profound disappointment that the jury in this case was not presented with a complete and fair picture of the matters in dispute. Rather, the trial stage of the odyssey resulted in defect so pervasive that the Court is compelled to order a new trial.

[21] In light of the precious time and resources lost to this case, the Court conveys its faint hope that this detailed Order might inspire the parties to examine this case anew— and weigh the substantial costs and uncertainty of additional judicial proceedings against resolution by settlement. The Court stands ready to assist the parties with any reasonable request that might facilitate such efforts.

proceedings related to ACCP and WPP issues; (2) the Trial; (3) the legal standards; and (4) the Court's analysis of the arguments presented by the parties at the Hearing and in post-trial briefings.[22] Further, to expedite efficient resolution of the proceedings, this Order will be followed by notice of a hearing—which must be attended ***in person by the parties and their lead counsel***—during which the Court will address procedural concerns and set deadlines for trial and a brief period of additional discovery.

## SUMMARY OF THE RECORD

Batchelor premised her Bad Faith Claim on allegations that: (1) Geico conducted an inadequate investigation of her claim for UM benefits ("**UM Claim**") and improperly discounted information and documents showing that the March Accident caused Batchelor to suffer a permanent injury—which is a condition precedent to recovery of damages for pain and suffering ("**PI Requirement**");[23] (2) Geico rejected multiple reasonable offers from Batchelor to accept the UM Limits; (3) upon receipt of information in 2006 and early 2007 that further corroborated that the PI Requirement was met and Batchelor was owed the UM Limits, Geico did not initiate settlement discussions—instead, Geico filed demonstrably inadequate proposals for settlement ("**PFS**") in the amounts of **$2,500.00**; and (4) Geico's final PFS for the UM Limits ("**2007 Tender**") was

---

[22] The parties should not assume that the Court overlooked any argument because it is not expressly discussed in this Order. After considering the entirety of the parties' papers, the Court summarily rejected tangential, unsupported, irrelevant, and hyperbolic arguments and only addressed those with merit. Similarly, the Court will summarily deny any motion for reconsideration that simply rehashes previous arguments. *See Madura v. BAC Home Loans Servicing L.P.*, 851 F.Supp.2d 1291, 1296 (M.D. Fla. 2012) (noting that motions for reconsideration consume scarce judicial resources and are justified only by "an intervening change in controlling law," new evidence not previously available to the parties through diligent efforts, or "the need to correct clear error or manifest injustice").

[23] The PI Requirement is set forth in the Policy and in Florida Statutes, § 627.737(2). (*See* Doc. 136, p. 3.)

untimely and was not made in good faith. (*See* Doc. 134, pp. 2–5; *see also* Docs. 67, 67-2, 67-3.)

Geico denied Batchelor's allegations and claimed that its unsuccessful 2007 Tender and offers to settle for **$2,500.00** satisfied the requirements of § 624.155(1)(b)(1) because: (1) Batchelor's damages for the March Accident were limited to her out-of-pocket medical expenses ("**OPME**") because Batchelor did not suffer a permanent injury until **October 12, 2005**, when Batchelor was involved in another automobile accident ("**October Accident**"); and (2) due to the PI Payments, Batchelor had incurred only **$1,700.00** in OPME, which were adequately covered by the Windsor Payment. (*See* Doc. 134, pp. 5–15; Doc. 212; *see also* Doc. 185, pp. 4, 12, 13, 16.)

## I.    Pre-Trial

The parties' contentious discovery included mutual challenges to their respective WPP and ACCP assertions. Based on Federal Rule of Civil Procedure 26(b)(3), Geico successfully challenged Batchelor's WPP assertions and obtained documents from the litigation file of her attorneys in the UM Coverage Action—Alpizar, David Alpizar and Alpizar Law, LLC ("**Coverage Counsel**"). (*See* Docs. 113, 114.) Batchelor's challenges to Geico's assertions of WPP and ACCP met with less success. (*See* Docs. 108, 116.)

Batchelor propounded discovery on Geico seeking "[r]ecords, of any and all efforts made, investigation pertinent to the [March Accident], the parties, [and] coverage available to Batchelor from March 2, 2005 through the date of Final Judgment" in the UM Coverage Action. (*See* Doc. 77-2, p. 1.) Batchelor also sought: (1) "all non-privileged portions of claims files pertinent" to the UM Coverage Action; and (2) the "entire files" of the "Law Offices of Stephen L. Lanoso and/or Lori Nazry and/or" Formella. (*See*

Doc. 77-2, p. 2.)

Initially, Geico produced no documents created after **December 7, 2007**

("**Relevance Objection**"), and it withheld voluminous materials based on its assertions

of the ACCP and WPP. (*See* Doc. 77-3, pp. 10–11.) In its 128-page privilege log ("**First**

**Log**"), Geico described many of the withheld documents as "communications, mental

impressions and thought processes of ["**Retained Counsel**"] and ["**In-House Counsel**"]

performing in [their] professional capacity as attorney[s] in rendering legal services to

Geico." (*See* Doc. 77-3, pp. 1–2; Doc. 77-4.) Geico identified "In-House Counsel" as

Roberta Sacks and Rori Busman, who both worked in Geico's home office, and Geico

identified "Retained Counsel" as Formella and Lori Nazry, who were Geico's employees,

but worked in The Law Office of Stephen L. Lanoso. (*See* Doc. 77-3.)

Arguing that Geico's First Log was deficient, Batchelor moved to compel and

requested *in camera* review of the withheld documents pursuant to *Genovese v.*

*Provident Life & Accident Insurance*, 74 So. 3d 1064 (Fla. 2011) ("**Batchelor's MTC**").[24]

(*See* Doc. 77, pp. 8–9.) Geico responded that *Genovese* was inapplicable because Geico

"did not even involve" Retained Counsel in Batchelor's claim for UM Benefits until Plaintiff

---

[24] Declining to extend its prior holding that parties *may not* assert WPP to withhold materials during discovery in bad faith actions, in *Genovese*, the Supreme Court of Florida held that parties *may* assert ACCP to withhold materials during discovery in bad faith actions. *See Genovese*, 74 So. 3d at 1066–68 (distinguishing *Allstate Indem. Co. v. Ruiz*, 780 So. 2d 239 (Fla. 4th DCA 2001)). Because insurers often hire attorneys "to both investigate the underlying claim *and* render legal advice," the *Genovese* Court further held that trial courts "should conduct an *in camera* inspection to determine whether the sought-after materials are truly protected" by the ACCP. *See id.* at 1068. The *Genovese* Court emphasized that its holdings were "not intended to undermine any statutory or judicially-created waiver or exception to the privilege." *See id.* at 1069 (warning that an insurer's reliance on an advice of counsel defense will result in waiver of ACCP); *see also infra* DISCUSSION.

filed the UM Coverage Action, and *Genovese* requires *in camera* inspection only when an insurer hires counsel to *both* defend a coverage action and investigate the claim for non-litigation purposes. (*See* Doc. 84, pp. 10–11.) In her reply, Batchelor urged the Court to conduct an *in camera* inspection of the withheld documents to insure that Geico was not contravening *Genovese* by using ACCP to conceal evidence critical to Batchelor's Bad Faith Claim—particularly, the circumstances surrounding the 2007 Tender. (*See* Doc. 90, pp. 3–4; Doc. 90-1.)

U.S. Magistrate Judge Gregory J. Kelly rejected Geico's Relevance Objection and required it to produce documents created through the date the state court entered judgment against Geico in the UM Coverage Claim. (*See* Doc. 108 ("**June Order**").) Agreeing with Batchelor that Geico's First Log was inadequate, Judge Kelly also directed Geico to produce an amended privilege log. (*See id.*; *see also* Docs. 110, 90, 84, 77.) Accepting Geico's representations to the Court that Retained Counsel's role was limited to defense of the UM Coverage Action—not claims handling—Judge Kelly did not conduct an *in camera* inspection of the documents Geico withheld. (*See* Doc. 108.) Batchelor did not appeal the June Order, and the Court adopted and affirmed it over Geico's appeal.[25] (*See* Doc. 116.) Ultimately, Geico produced an 87-page amended privilege log (Doc. 110-1 ("**Amended Log**")), which Batchelor did not challenge before trial.

## II.   The Trial

### A.   The Opening Statements

In her opening statement, Batchelor advised that the evidence at Trial would

---

[25] Geico did not appeal Judge Kelly's rejection of Geico's Relevance Objection. (*See* Doc. 110.) Rather, Geico only challenged Judge Kelly's decision that the First Log was inadequate. (*See id.*)

establish that Geico breached its promise under the Policy and its statutory duties to act toward Batchelor with good faith when Geico refused to fairly compensate Batchelor after she suffered a permanent injury in the March Accident. (*See* Doc. 222, pp. 122–42.) Batchelor told the jury that Geico geared its "investigation and evaluation" of Batchelor's UM Claim "towards minimizing" its "liability rather than conducting an honest and fair investigation to confirm or rebut the injuries that [Batchelor] alleged she suffered in the [March Accident]." (*Id.* at 125–26.)

In Geico's opening statement, it immediately focused on the October Accident, framing the "simple issue" before the jury as whether it was "bad faith for Geico to believe" that Batchelor's injuries were caused by the October Accident instead of the March Accident. (*See* Doc. 185, pp. 2–3, 7, 8, 20.) Noting that Geico paid Batchelor's claim related to the October Accident "immediately" and in full, Geico advised the jury that the evidence would include notes written by Batchelor's attorney in the UM Coverage Action—Alpizar—which would establish his "knowledge" that Batchelor's "surgeries were related" to the October Accident. (*See id.* at 5–7, 18–22). In contrast, Geico advised that *its attorney* in the UM Coverage Action would "testify to defend Geico." (*See id.* at 18.)

### B.    The Evidence

In her case-in-chief, Batchelor called six witnesses—her claims handling expert Susan Kaufman (Doc. 223, pp. 28–103), and five Geico employees: (1) Shelley Matthews Maldonado ("**Maldonado**"), who handled the UM Claim in June and July of 2005 (Doc. 222, pp. 160–222); (2) Maldonado's supervisor Kip DeKalb ("**DeKalb**") (Doc. 222, pp. at 226–65); (3) Peggy Thagard ("**Thagard**"), who handled the UM Claim from August 2005 through October 2006 (Doc. 200, pp. 3–159); (4) Aletha Small ("**Small**"), who

handled the UM Claim from October 2006 through 2009 (*id.* at 131–59); and (5) Gary Gertz ("**Gertz**"), who was a regional claims manager (*id.* at 11–20). In its defense, Geico called Alpizar, Formella, claims handling expert John Atkinson, Esq., and Gregory Santini ("**Santini**"), who was Thagard's supervisor. (*See* Docs. 211, S-194.)

### 1.    Geico's Claims Handling Before the UM Coverage Action

When Batchelor reported the March Accident, Geico immediately documented the claim—particularly the actions of its claims adjustors, evaluations of the claim, and settlement efforts—in an electronic activity log ("**A-Log Notes**"). (*See* Doc. 222, pp. 146, 167–68; *see also* Plaintiff's Exhibit A-1.) Alpizar testified that on **April 20, 2005**, Batchelor retained him on a contingency basis to handle her UM Claim (Doc. 211, pp. 12–14), and on June 30, 2005, he presented the UM Claim to Geico and Windsor. (Joint Exhibit 4 ("**First Demand**").) Geico never contested coverage under the Policy or the liability of the Driver; thus, from the outset, the only matter at issue was the value of Batchelor's UM Claim. (*See* Doc. 222, pp. 169–70.)

### a.    The First Demand

The First Demand included correspondence from Alpizar (Joint Exhibit 4, pp. GHOC 0479–0486), and copies of the accident report (*id.* at GHOC 0489–0490), the traffic citation issued to the Driver (*id.* at GHOC 0492–0494), and Batchelor's medical bills and records, including: (1) a magnetic resonance imaging ("**MRI**") report from Dr. Jeffrey S. Araj ("**Araj Report**"); (2) results of a nerve conduction study ("**NCS**") and an electromyography test ("**EMG**") that were positive for radiculopathy ("**Radiculopathy Reports**"); and (3) medical status worksheets indicating that Batchelor was *not* suffering from "[d]iabetes [m]ellitis" (*id.* at GHOC 0509, 0522, 0528). Noting that the Driver's liability

was clear, and Batchelor's physical injuries—particularly two herniated discs ("**HD**") with positive tests for radiculopathy—met the PI Requirement, Alpizar represented that Batchelor's had suffered damages of **$191,017.32**, which was comprised of: (1) **$8,247.32** in past medical expenses; (2) **$53,770.00** in future medical expenses; (3) **$34,000.00** in lost earning capacity; and (4) **$95,000.00** for pain, suffering, and loss of capacity for the enjoyment of life. (*See id.* at GHOC 0484.) Alpizar demanded that Windsor pay Batchelor the Driver's **$10,000.00** of insurance coverage ("**Windsor Limits**"). (*See id.* at GHOC 0479–0486.) Because the Windsor Limits could not compensate Batchelor for all of her damages, Alpizar also demanded that Geico pay Batchelor the UM Limits. (*See id.*)

### b.    Geico's Claims Handling in the TRC-II Unit

DeKalb received the First Demand, which he referred to Maldonado, who was a claims examiner in the unit where Geico handled claims for "soft tissue" injuries ("**TCR-II Unit**"). (*See* Doc. 222, pp. 210, 228–31.) Based solely on her review of the Policy and the First Demand, Maldonado concluded that the Windsor Limits were sufficient to cover Batchelor's damages, and she recommended that Geico respond to the First Demand with an offer of **$1,000.00**, and then offer **$2,500.00** if Windsor tendered the Windsor Limits ("**First Evaluation**"). (*See id.* at 187, 195, 198–99, 203, 222; *see also* Plaintiff's Exhibit A-1, at GLC 6600.) Maldonado included the First Evaluation in the A-Log Notes, and further wrote that: (1) Batchelor's vehicle was a "total loss"; (2) the Araj Report noted a "very small" HD at L4/L5 and a "small" HD at L5/S1; (3) the Radiculopathy Report showed radiculopathy around the S1 nerve, "But Nothing Shows

Impingement";[26] (4) Batchelor was 31-years-old, stood 5'1" tall, and weighed 192 pounds; (5) Batchelor waited a month to start treatment for her back pain; and (6) Batchelor's OPME was **$1,705.25**. (*See* Plaintiff's Exhibit A-1, at GLC 6600.)

Maldonado authored Geico's initial response to the First Demand (Joint Exhibit 6 ("**First Response**")), which DeKalb approved without independently evaluating or investigating the UM Claim. (*See* Doc. 222, pp. 247–48, 259–60.) The First Response advised that Geico considered Batchelor's back injury to be "soft tissue" at best, and the Windsor Limits provided "plenty of coverage" to pay Batchelor's OPME. (*See* Joint Exhibit 6.) Rather than offer Batchelor $1,000.00 as recommended in the First Evaluation, Geico advised that it was "not in a position to offer" a UM settlement, but it may "re-evaluate" its position if Windsor tendered the Windsor Limits. (*Id.*)

On **July 22, 2005**, Alpizar sent Geico notice that Batchelor had received the Windsor Payment, and he again demanded that Geico pay Batchelor the UM Limits. (*See* Joint Exhibit 7 ("**Second Demand**").) Geico did not comply with Alpizar's demand to tender the UM Limits, but it did retain its subrogation rights against the Driver by tendering **$10,000.00** to Batchelor in lieu of her acceptance of the Windsor Payment.[27] (*See* Joint Exhibits 7, 10; *see also* Joint Exhibit 1, at Form 1543.)

---

[26] According to Maldonado, the Radiculopathy Report did not establish a permanent injury because the radiculopathy noted did not correlate with the Araj Report. (See Doc. 222, pp. 187, 195, 198–99.) Nonetheless, Maldonado testified that she evaluated the UM Claim "as if" Batchelor breached the PI Requirement. (*See* Doc. 222, pp. 192–94).

[27] Pursuant to § 627.727(6)(b), if an insurer does not authorize its insured to settle with an underinsured tortfeasor pursuant to § 627.727(6)(a), then the insurer must pay its insured "the amount of the written offer from the underinsured" tortfeasor's insurer. In making this payment to its insured, the UM Benefits insurer preserves its "subrogation rights" against the tortfeasor and the tortfeasor's insurer. *See* Fla. Stat. § 627.727(6)(b).

### c. Geico's Claims Handling in the Continuing Unit

After Geico sent its First Response to Alpizar, DeKalb transferred the UM Claim from the TCR-II Unit to Thagard, who worked in the unit where Geico handles claims involving more severe injuries—the Continuing Unit ("**CU**").[28] (*See* Doc. 222, p. 252; *see also* Doc. 200, pp. 54, 109.) DeKalb testified that he transferred the UM Claim to CU based on A-log Notes documenting Geico's receipt of a verbal notification from Coverage Counsel that Batchelor was a surgical candidate. (*See* Doc. 222, p. 252; *see also* Joint Exhibit 8; Plaintiff's Exhibit A-1, p. GLC 6599.)

Thagard testified that her investigation of the UM Claim was limited to: (1) requesting documentation from Alpizar; (2) obtaining the Raskin Report; and (3) searching for evidence that Batchelor's back problems were caused by something other than the March Accident. (*See* Doc. 200, pp. 14, 22–23, 27, 62–63, 78–80, 90–91.) Thagard also testified that: (1) the Driver's liability was clear; (2) Alpizar cooperated with her requests for information; (3) Geico had a realistic opportunity to settle with Batchelor for the UM Limits; (4) the Radiculopathy Reports showed nerve damage that Thagard could not explain; and (5) nothing before the March Accident explained Batchelor's back problems. (*See id.* at 9, 27, 111.) Nonetheless, based on Batchelor's delay in obtaining medical treatment and the fact that the March Accident was "low impact," and no other passenger was injured, Thagard testified that she believed that Batchelor had not suffered a permanent injury. (*See id.* at 68–72, 99–101, 113–14, 120–21.) Thagard denied seeing treatment notes dated **September 20, 2005**, which documented that Batchelor's primary

---

[28] Thagard also handled Batchelor's claim for UM Benefits for the October Accident; however, she testified that she completed her work on the UM Claim before working on the claim for the October Accident. (*See* Doc. 200, pp. 54, 107, 110).

care physician—Gary Weiss, M.D. ("**Dr. Weiss**")—had referred Batchelor to Charles S.

Theofilos, M.D. ("**Dr. Theofilos**") for a "neurosurgical evaluation" ("**Surgery Note**").[29]

(*See id.* at 47–48; Plaintiff's Exhibit A-6.)

On **August 8, 2005**, Thagard authored Geico's response to the Second Demand

("**Second Response**"), which did not mention the UM Limits, but requested that Alpizar

submit: (1) "complete" medical records from Dr. Weiss; (2) the MRI images from the Araj

Report ("**MRI Film**"); (3) records from Batchelor's primary care physician ("**PCP**") for the

prior five years; and (4) documentation related to Batchelor's lost income demand. (*See*

Joint Exhibit 9; *see also* Plaintiff's Exhibit A1, p. GLC 6598) Two days later, Alpizar

submitted a CRN accusing Geico of violating § 624.155(1)(b)(1) by not offering to settle

the UM Claim. (*See* Joint Exhibit 10 ("**First CRN**").)

In correspondence to Thagard dated **August 29, 2005** ("**Fourth Demand**"), Alpizar

advised that Batchelor did not possess income documentation, and due to her previous

good health, she also did not have PCP records. (*See* Joint Exhibit 13.) Nonetheless,

Alpizar provided copies of additional medical records and advised that he would provide

the MRI Film upon receipt of the provider's copying costs. (*See id.*) Finally, Alpizar again

demanded that Geico tender the UM Limits. (*See id.*)

Alpizar sent Thagard the MRI Film on **September 9, 2005**. (*See* Joint Exhibits 16

& 17.) The next day, Thagard requested a "comparative review" from Michael M. Raskin,

M.D. ("**Dr. Raskin**"). (*See* Joint Exhibit 18.) In a report dated **September 16, 2005**

("**Raskin Report**"), Dr. Raskin opined that the MRI Film showed only "mild bulging" and

---

[29] Thagard also denied seeing a report from Dr. Theofilos dated **June 22, 2006**
("**2006 Surgical Report**"), which indicated that Batchelor's treatment options included
epidural injections and surgery. (*See* Doc. 200, pp. 47–48; *see also* Joint Exhibit 29.)

no "evidence of disc herniation or nerve root impingement." (*See* Joint Exhibit 19.)

On **September 23, 2005**, Thagard sent a copy of the Raskin Report to Alpizar along with Geico's first offer to pay Batchelor **$2,500.00** to resolve the UM Claim ("**First Offer**"). (*See* Joint Exhibit 20; *see also* Doc. 200, p. 32.) Alpizar then submitted another CRN complaining that Geico acted in bad faith by offering only **$2,500.00** even though Batchelor suffered "significant permanent injuries" in the March Accident ("**Second CRN**"). (Joint Exhibit 22.) In response, Thagard reiterated Geico's offer of **$2,500.00**, which Thagard described as "fair" because "no injuries" were reported at the scene of the March Accident, Batchelor did not "seek medical treatment" for a month, and the MRI Films did not support radiculopathy  ("**Second Offer**"). (*See* Joint Exhibit 23; *see also* Doc. 200, p. 32.) Geico also advised that it was willing to participate in "pre-suit mediation." (Joint Exhibit 23.)

### 2.    Geico's Claims Handling During the UM Coverage Action

On **December 29, 2005**, Alpizar initiated the UM Coverage Action, which Geico assigned to Retained Counsel. (*See* Joint Exhibit 25; Plaintiff's Exhibit A-1, at GLC 6593; *see also* Doc. 200, pp. 47–48, 54, 109.) Until **October 2006**, Thagard continued to handle the UM Claim in the CU, and she testified that Formella communicated with her every month concerning developments in the UM Coverage Action. (*See* Doc. 200, pp. 47–48, 54, 109; Plaintiff's Exhibit A-1, at GLC 6593.)

On **October 5, 2006**, the UM Claim was reassigned to Small in the CU Unit, and Small handled it until **2009**. (*See* Doc. 200, p. 139; Plaintiff's Exhibit A-1, at GLC 6588.) Small could "independently" recall almost nothing about the UM Claim. (*See* Doc. 200, pp. 139–59.) Although she admitted that she had "a duty to reevaluate" the UM Claim,

she could not remember doing so. (*See id.* at 138–41.) Small also could not recall whether: (1) she determined if Batchelor's injuries were permanent or were caused by the March Accident; (2) she evaluated the UM Claim as "a soft tissue injury or herniated disk;" (3) she agreed with the **$2,500.00** offer made to Batchelor and the evaluations of the UM Claim that were done before Small was assigned to the UM Claim; (4) she ever received or knew of the 2006 Surgical Report; (5) Batchelor had "invasive surgical procedures" in **October of 2007**; and (6) Small did anything in the Fall of 2006 to investigate, evaluate, and try to settle the UM Claim.  (*See id.* at 133–35, 139.)

Small testified that she needed to rely on the "notes that were in the file" to aid her memory, and she did review the A-Log Notes before Trial, but she still could not recall the UM Claim because there were things that she "couldn't see."[30] (*See id.* at 131–34.) After Batchelor's counsel had Small review the A-Log Notes during Trial, Small reiterated that: "[q]uite a few of the notes I'm unable to view to know what I did. And I don't remember exactly what I did." (*See id.* at 135–36; *see also* Plaintiff's Exhibit A-1.) Small then unsuccessfully searched for documentation of the 2006 Surgical Report in the A-Log Notes and testified that "there's a lot of redacted notes, so I don't know if it's in that part." (*See* Doc. 200, p. 140.)

After much effort from Batchelor's counsel, Small ultimately testified that:

(1)     she "work[ed] together" with Formella, who likely took over the "*investigative piece*" and kept Small updated on a monthly basis;

(2)     she hired a private investigator to surveil Batchelor for two days in **January 2007**—though noting "major" was discovered;

---

[30] Small agreed that generally, a-log notes were made so that she could remember the claims she worked on years later at trials, but "there's an enormous part" of the A-Log Notes for the UM Claim that Small "can't see." (*See* Doc. 200, p. 141.)

(3)     in **April 2007**, she employed a tool—ISO—to see if Batchelor had another loss or claim before or after the March Accident, but she could not recall if the ISO revealed anything;

(4)     on **September 12, 2007**, Small documented that Batchelor was scheduled for an independent medical exam ("**IME**") with Dr. Uricchio in December; and

(5)     on **October 16, 2007**, Small updated Batchelor's background check, hospital canvass, and pharmacy canvass—but Small again could not recall if she found anything from the searches.

(*See id.* 137, 139–45; *see also* Plaintiff's Exhibits A-10 & A-13.)

In **Fall 2007**, Geico filed two PFS in the UM Coverage Action.[31] The first PFS—filed on **September 12, 2007**—offered Batchelor **$2,500.00** to settle her claim and her husband's loss of consortium claim. (Plaintiff's Exhibit A-11 ("**First PFS**").) In **October**, Geico again offered Batchelor **$2,500.00** to settle her claim. (Plaintiff's Exhibit A-12 ("**Second PFS**").)

Small testified that she could not authorize a PFS on her own, and she denied that she decided to file the First or the Second PFS. (*See* Doc. 200, pp. 143–44.) Small also testified that it was Geico's practice to document "all settlement decisions" in activity notes, but—although there were "redacted notes" in the A-Log Notes—Small did not "see

---

[31] Florida law provides that, in any civil action for damages, the defendant may make an "offer of judgment" to the plaintiff (the PFS). *See* Fla. Stat., § 768.79; *see also* Fla. R. Civ. P. 1.442. If the plaintiff does not accept the PFS within 30 days and then either fails to establish the defendant's liability or establishes such liability but does not obtain a judgment equaling at least 75% of the PFS, then the plaintiff is penalized by paying the reasonable costs and attorney's fees incurred by the defendant from the date of the PFS. *See Pratt v. Weiss*, 161 So. 2d 1268, 1277–79 (Fla. 2015). A valid PFS must be written and state certain specific terms—including the "total amount" of the amount offered. Fla. Stat. § 768.79(2). A PFS is "construed as including all damages which may be awarded in a final judgment." *Id.* Like defendants, plaintiffs may recover a portion of their reasonable costs and attorney's fees if they recover a judgment "in an amount at least 25 percent greater than" their PFS to defendants. *See id.* § 768.79(1).

anything that would indicate who would have" made the decision to issue the First or Second PFS. (*See id.* at 144.)

When shown a "Control File Alert" that Small submitted to Geico's home office on **October 29, 2007** (Plaintiff's Exhibit A-13 ("**Alert**")), Small identified the Alert, but she could not recall: (1) why she submitted the Alert; (2) why she checked "settlement authority" and "urgent" on the Alert; (3) why she wrote that she needed to "discuss possibly a new PFS;" (4) whether she was requesting "settlement authority at the" UM Limit; and (5) what was done with the Alert after she submitted it to Geico's home office. (*See* Doc. 200, pp. 146–49.)

Gertz—who was a regional claims manager for Geico and "signed off" on the Alert—testified that the Alert was a way to "transmit files" from a regional Geico office to Geico's "claims home office legal" in Washington, D.C. when approval was needed. (*See* Doc. 223, p. 12–13.) Gertz testified that he thought the Alert was used because "there was a demand above" the limits of the Policy, and Small was seeking settlement authority. (*See id.* at 13–14.)

Based on additional A-Log Notes, Small testified that it appeared that In-House Counsel Roberta Sacks ("**Sacks**")—who was deceased at the time of Trial—addressed the Alert on **November 6, 2007**, by authorizing a PFS for the UM Limits "per our discussion" ("**Sacks PFS**"). (*See* Doc. 200, pp. 149–50; *see also* Doc. 223, p. 20.)  Small testified that the A-Log Notes indicated that on **November 8, 2007**, Sacks changed her mind and wrote: "I Am Rethinking the [PFS] Issue. There Is No Reason to Increase." (Plaintiff's Exhibit A-1, at GLC 6579; *see* Doc. 200, p. 150.)

Finally, Batchelor's counsel showed Small a document titled "Claim Evaluation Summary", which Small admitted creating on **November 27, 2007,** with a computer program claim evaluation "tool" called "ClaimIQ" (Plaintiff's Exhibit A-19 ("**November 2007 Evaluation**"). (*See* Doc. 200, pp. 150–53.) Based on information Small input—including that Batchelor suffered a permanent injury, her "pain and suffering" amounted to "zero dollars," and the amount of Batchelor's medical expenses incurred through February 22, 2006—the ClaimIQ program indicated the value of the UM Claim was **$13,250** to **$16,250**. (*See* Plaintiff's Exhibit A-19; Doc. 200, pp. 150–58.) Small further testified that:

(1)    before accounting for the Windsor Payment, the ClaimIQ program indicated that the "negotiation range" for the UM Claim was **$12,500** to **$46,705.25**;

(2)    she overrode the ClaimIQ program to assign Batchelor's "past and future medical" expenses a value of **$2,000** and her "pain and suffering at **$500**"—but she could not recall why she did so; and

(3)    after Small's override, the ClaimIQ program evaluation indicated that the "negotiation range" for the UM Claim was **$2,500** to **$36,705.25**.

(*See* Plaintiff's Exhibits A-19; Doc. 200, pp. 137, 139–45, 150–57.) Geico declined to cross-examine Small. (*See* Doc. 200, p. 159.)

The day after Small created the November 2007 Evaluation, Formella sent correspondence to Alpizar advising that "GEICO is hereby tendering" the UM Limits "for the accident of 3/5/05 due to the new information provided in the November 14 update deposition of Donna Batchelor and the November 20 deposition of Thomas McGee, MD." (*See* Joint Exhibit 36 ("**Tender Letter**").) Formella requested that Alpizar have Batchelor and her husband "execute a standard release concerning this matter." (*Id.*) Batchelor rejected the 2007 Tender. (*See* Plaintiff's Exhibit A-21.)

Gertz—who denied that he was "really involved" in Batchelor's UM Claim—testified that: (1) he did not know who authorized the 2007 Tender; (2) he did not "have any independent recollection" that he authorized the 2007 Tender; and (3) he was not "aware of" being involved in the decision to authorize the 2007 Tender.[32] (*See* Doc. 223, pp. 14–15.) Gertz further testified that "[i]f the file was on control," then "authority would have come from claims home office." (*See id.* at 15.) Based on the A-Log Notes, Gertz also noted that "Roberta Sacks was the assigned attorney in the claims home office." (*See id.* at 15, 19–20; *see also* Doc. 200, p. 159.)

Gertz and Small both confirmed that the A-Log Notes did not indicate who authorized the 2007 Tender or the First or Second PFS. (*See* Doc. 200, pp. 158–59; Doc. 223, pp. 16–17; *see also* Plaintiff's Exhibit A-1.) Gertz and Small also both confirmed that the absence of documentation concerning the 2007 Tender was inconsistent with Geico's practice to document all decisions concerning settlement. (*See* Doc. 223, p. 17; Doc. 200, p. 150.)

### 3.    Expert Witness Testimony

Before resting her case, Batchelor presented opinion testimony from expert witness Susan Kaufman ("**Kaufman**") that Geico's characterization of Batchelor's injury as "soft tissue" was a "misevaluation." (*See* Doc. 223, pp. 42–43.) Kaufman further opined that Geico acted in bad faith in handling Batchelor's UM Claim, and such bad faith was evidenced by: (1) Maldonado's failure to investigate the UM Claim; (2) Thagard's minimal investigation, disregard of the Radiculopathy Report, and reliance on the Raskin Report

---

[32] Small also denied that she knew who authorized the 2007 Tender or the basis for that decision. (*See* Doc. 200, pp. 158–59.)

over opinions of Batchelor's treating physicians; (3) Geico's failure to escalate its investigation and involve management after receiving the CRNs; (4) Geico's delayed investigation even after the UM Coverage Action was filed; (5) Geico's failure to reevaluate the UM Claim upon receipt of new information in the UM Coverage Action; (6) Geico's failure to tender the UM Limits after receiving the Theofilos Report; and (7) Geico's First and Second PFS for **$2,500.00** even though Geico had set its reserves for the UM Claim in excess of the UM Limits. (*See id.* at 37, 46, 51–53, 55–57, 64, 97–98.) Kaufman also opined that Geico should have determined that the PI Requirement was satisfied based on Batcherlor's age, her history of good health, and the treating physician's HD findings. (*See id.* at 43–44.)

Geico presented opinion testimony from expert witness John Atkinson, Esq. ("**Atkinson**"). Atkinson testified that Geico was in an *adversarial position* with Batchelor because Geico was "looking at" her UM Claim "as if it were the insurer for the offending driver." (*See id.* at 32, 77.) According to Atkinson, Batchelor had the burden to "bring forward a claim," and she did not meet that burden because she did not submit a permanency rating from a physician or other documentation establishing a permanent injury or specifying the cost of future medical care. (*See id.* at 42, 44–46, 55–56.)

Atkinson opined that Geico's evaluations of Batchelor's UM Claim was in good faith because the facts known to Geico justified the position that Batchelor did not satisfy the PI Requirement. (*See* Doc. 211, pp. 35, 38–46, 51–52, 56, 107.) Such facts included that: (1) Batchelor's OPME were only **$1,700.00** (*see id.* at 35, 43); (2) the March Accident was "mild" while the October Accident was severe; (3) Batchelor provided inconsistent reports concerning the onset of her back pain, and she did not have surgery until 2007;

(4) Geico's records included no documentation of a referral for surgery before the UM Coverage Action; (5) it would be "very unusual" for a person who suffered a permanent injury to wait as long as Batchelor did to obtain medical attention; and (6) the Araj and Raskin Reports did not "indicate nerve impingement." (*See id*.) Atkinson further opined that the positive Radiculopathy Report could be explained by *diabetes*. (*See id*. at 40–41.)

Atkinson acknowledged that Gieco had a continuing duty of good faith after the UM Coverage Action was filed, but he testified that the investigation "fell into" *Formella*'s "province." (*See id*. at 92–93.) Atkinson then noted that *Formella* provided Geico with regular legal updates during the UM Coverage Action, which provided information concerning Batchelor's continuing medical treatments and expenses in 2006. (*See id*.) Although Atkinson did not identify who authorized the First or the Second PFS or the 2007 Tender, he opined that all of Geico's settlement offers were consistent with Geico's good faith obligations based on available information. (*See id*. at 64–65.) Atkinson testified that his opinions concerning Geico's good faith were based on his review of five banker's boxes of materials related to the UM Claim. (*See id*. at 31.)

**C.    Formella's Testimony & Batchelor's Motion for Mistrial**

Before calling Atkinson, Geico called Formella to testify. (Doc. S-194.) Like Atkinson, Maldonado, and Thagard, Formella testified that he investigated the UM Claim and he provided updates to Geico that its claims examiners relied on to satisfy their good faith obligations concerning the UM Claim. (Doc. S-194, pp. 14–15.) Formella testified that it was his "job" to investigate the UM Claim "as an employee of Geico." (*Id*.)

Formella also testified that he "evaluated" the UM Claim, and he believed that Batchelor did not suffer a permanent injury sufficient to meet the PI Requirement as a result of the March Accident. (*Id.* at 11–15.) Formella testified that he based this belief on the "medical records, the imaging that had been done," Batchelor's own statements concerning "when her complaints started," "the nature" of the October Accident—"nobody else in the car was hurt"—and "so forth." (*Id.* at 11–15.) Formella testified that medical records showing that Batchelor suffered HDs or bulging discs were not "unusual" for someone of Batchelor's age who "had some children." (*See id.*) Formella also opined that HD will not cause radiculopathy absent nerve impingement. (*Id.*)

In response to Geico's questioning concerning the First and Second PFS, Formella testified that he signed the PFS and sent it after "***they told me to do the proposal and the amount.***" (*See id.* at 8–9 (emphasis added).) Geico then asked: "***Would you have sent [the PFS] if you disagreed with the offer that was being made by Geico, your employer?***" (*Id.*) Formella responded: "***Well, no, but I didn't disagree. There was no reason to disagree.***" (*Id.* at 10 (emphasis added).) After confirming that Formella "agreed with the offer that Geico was making at the time," Geico asked him "***why?***" (*Id.*) Formella responded:

> Well, like I said, the person who was involved in the accident with Miss Batchelor—I believe her name was Miss Arnold—she had a policy of insurance that afforded **$10,000** in what's known as bodily injury coverage or liability coverage for having caused the accident.
>
> In addition to that, Miss Batchelor had her no fault or PIP coverage under her GEICO policy, which you may have already heard about, but that pays for medical and wage loss up to **$10,000**.[33] So she already had available to her **$20,000**.

---

[33] In the UM Coverage Action, Geico requested an offset of only **$7,082.60** for PI Payments to Batchelor—not **$10,000.00**.

In Florida, to recover more than your economic losses or what are known as your medical bills—in a personal injury case, your medical bills, your lost wages, you have to—under the law, you have to prove that you sustained what's known as a permanent injury, an injury that's going to be with you for the rest of your life. A permanent injury.

Looking at the facts of the case . . . it was the conclusion of my investigation that she had not sustained a permanent injury. And, therefore, what she would be—under the law, if she went to trial and the jury agreed that she had not sustained a permanent injury, what she would be limited to is recovery of her economic damages. She would not be entitled to pain and suffering damages.

So at that point in the case, her economic damages, after you deduct what she had already received from her no-fault coverage for the medical expenses and so forth, were, I think, about **$1,700**.

Now, considering she had **$10,000** available to her from the other insurance company, the other coverage, ***I evaluated the case as having a value within that underlying coverage of $10,000*** since she was only entitled to $1,700, because she did not have a permanent injury.

(*Id.* (emphasis added).) Formella concluded that the **$2,500.00** was "a nominal settlement" Geico made because Batchelor was not "going to take nothing and walk away." (*Id.*)

After Geico elicited the foregoing testimony from Formella, Batchelor's counsel advised the Court that Formella appeared to have perjured himself because Formella authored a litigation report dated **November 29, 2006** (the "**Formella Report**") that recommended a PFS of **$20,000.00**. (Doc. S-194, pp. 17–18.) Batchelor's counsel explained that he did not have a copy of the Formella Report because he "got rid of" it when directed to by Geico, who—despite its assertion of ACCP—had produced the Formella Report inadvertently. (*See id.*) Batchelor's counsel asked the Court for an opportunity to review the Formella Report *in camera* to confirm his recollection of its contents. (*See id.*) The Court granted the request, and Geico produced the Formella

Report, which confirmed that in 2006, Formella had recommended that Geico make a PFS in the UM Coverage Action of **$20,000.00**-—which was two times the "underlying coverage of $10,000" and approximately four times the $2,500.00 offered by Geico in the First and Second PFS (Court's Exhibit 2.)

Geico's counsel denied that he intended to elicit false testimony, and he even denied any knowledge that the Formella Report existed. (Doc. S-194, p. 20.) Geico's counsel proposed that the Formella Report be disclosed "*without a waiver of privilege over any other documents for cross-examination on this one issue.*" (*Id.* at 20–21 (emphasis added).) Batchelor's counsel countered that Formella's testimony should be stricken, and *Geico immediately agreed to that remedy.* (*See id.* at 21; *see also* Doc. 167.)

The Court agreed that Geico's questioning of Formella constituted a waiver of its previously-asserted ACCP ("**Waiver Decision**"), and it gave Batchelor two options. First, Batchelor could choose to have the Court immediately excuse Formella and "instruct the jury to disregard his testimony." (Doc. S-194, p. 22.) Second, Batchelor could choose to have the Court order Geico to produce Formella's "entire file from cover to cover and give [Batchelor] an opportunity to review the file in its entirety" with the "right to recall Mr. Formella at some later point in time after" review of the file. (*Id.*)

Batchelor chose the first option. Formella provided no further testimony on direct, and he was not subjected to cross-examination concerning the testimony he already provided. (*See* Doc. 168.) Without explaining why, the Court instructed the Jury to disregard Formella's testimony. (See Doc. 211.) Specifically, the Court advised the jury that "*the last witness has been excused, and I'm going to instruct you to disregard his testimony. It's been stricken in its entirety.*" (See *id.* at 24–25.)

Geico then finished presenting its defense, which was the testimony of Atkinson who—as noted above—relied in part on the actions taken by Formella as support for his expert opinion that Geico acted in good faith when it handled Batchelor's UM Claim. (*See* Doc. 176). Arguing that the record was "tainted" despite the Court's instruction to the jury to disregard Formella's testimony, Batchelor requested a mistrial. (*See* Docs. 169, 201.) The Court denied Batchelor's Motion. (*See* Docs. 201, 170.)

### D.   Closing Arguments

In closing, Batchelor argued that Geico first failed to exhibit good faith when, with no investigation, Geico dismissed Batchelor's back injury as "soft tissue at best"—even though Geico had the Radiculopathy Report and the Araj Report, which indicated that Batchelor suffered radicular symptoms and two HD. (*See* Doc. 211, pp. 128–30, 143.) Given that Batchelor was a young woman with no history of spinal injury or back pain, Batchelor argued that it was bad faith for Geico to deny that she satisfied the PI Requirement. (*See id.*) Batchelor argued that Geico continued to act in bad faith by unfairly and dishonestly adhering to its initial self-serving evaluation and limiting its investigation to a search for information to undermine Batchelor's UM Claim. (*See id.* at 134–35, 137–38.) According to Batchelor, Geico ignored information helpful to Batchelor, unfairly construed other information—such as the severity of the March Accident—against Batchelor, and even justified its evaluation with unsupported "facts"—for instance, that diabetes explained the positive Radiculopathy Report. (*See id.* at 128–34.)

Batchelor argued that Geico again exhibited its bad faith in 2006, when it: (1) increased its reserves to the UM Limits after learning that Batchelor's medical treatment plan included spinal surgery; and (2) then failed to offer Batchelor the UM Limits

or even reference the surgical recommendation in the A-Log Notes. (*See id.* at 139–41.) Instead, Geico waited more than a year—until after Batchelor actually underwent surgery—before it finally tendered the UM Limits. (*See id.* at 141.) Batchelor argued that she justifiably rejected the 2007 Tender because she had incurred significant additional costs and expenses as a result of Geico's bad faith delay. (*See id.*)

In its closing argument, Geico asserted that the evidence confirmed what it said at the outset of the Trial—that "Geico acted in good faith in the way it evaluated" Batchelor's UM Claim because it was reasonable "for Geico to believe that all of the treatment, the ongoing treatment, the surgeries that Miss Batchelor went through after" the October Accident "were caused by that" October Accident "instead of" the March Accident. (*See* Doc. 212, pp. 2, 19–20.) Geico urged the jury to find that Maldonado and DeKalb honestly believed that Batchelor suffered only "a soft tissue injury" that "was going to get better" with conservative treatment, and they fairly based such belief on the facts that: (1) the March Accident was "low-impact" and "nobody else" reported injuries; (2) Batchelor "waited over five weeks before she reported any injuries or pain to Geico and before she sought any medical treatment;" (3) Batchelor's initial treatment was conservative— chiropractic treatment, Pilates, and "a few visits with" a neurologist—but "nothing invasive;" (4) and the Araj Report indicated "no evidence or any neural impingement." (*See id.* at 2–4.) Geico argued that the absence of neural impingement was "probably the most important thing" the jury heard "in the entire trial"—because it meant that Batchelor's HD had "nothing to do" with her back pain. (*See id.* at 6.) Geico urged the jury to dismiss the positive radiculopathy finding as attributable to "*diabetes*" or to a "false positive." (*See id.* at 7.)

As to the First and Second Offers, Geico argued that it was fair to offer only **$2,500.00** given Thagard's beliefs that Batchelor had not satisfied the PI Requirement and her economic damages "were within" the available **$20,000.00** in coverage. (*See id.* at 9.) Geico contended that Thagard's beliefs were justified by all the factors relied on by Maldonado and DeKalb, as well as the fact that Batchelor had only **$1,700.00** in OPME, and—based on the conservative "Pilates exercise classes" treatment Batchelor was prescribed—Thagard honestly believed that Batchelor's "future medical expenses" would be minimal. (*See id.* at 9–11.)

Geico also urged the jury to find that its investigation was in good faith based on: (1) testimony from Maldonado and Thagard that they both unsuccessfully phoned Alpizar; and (2) testimony from Thagard that she requested additional records from Alpizar in writing and had the MRI Film reviewed by a radiologist "she trusted"—Dr. Raskin. (*See id.* at 5–6.) Conceding that it obtained a lot more information about Batchelor's injury and damages after the October Accident—particularly in 2006—Geico argued that such information confirmed Geico's belief that any permanent injury Batchelor may have suffered was caused by the October Accident; thus, it was not bad faith for Geico to continue to litigate against Batchelor until Fall 2007. (*See id.* at 12–14.)

Geico then advised the jury that the 2007 Tender was authorized by In-House Counsel Roberta Sacks—who "unfortunately" could not be at trial to tell the jury about such authorization because "she's passed away." (*See id.* at 14–15.) Unable to reference Formella's stricken testimony, Geico urged the jury to find that Formella's correspondence conveying the 2007 Tender "clearly" identified Geico's honest and fair reasons for the offer—that Batchelor had finally undergone surgery and a doctor had opined during

deposition on **November 20, 2007** that the initial MRI Film *did* show an "abnormality" that could cause radiculopathy. (*See id.* at 14–15.) According to Geico, it exercised good faith by paying the UM Limits "within a week of the first doctor telling them that he saw evidence on nerve root impingement on an MRI that pre-dated the" October Accident. (*See id.* at 15–16.)

Next, Geico urged the jury to review a document authored by Alpizar which lamented that Geico would have an "opportunity to pay" on the October Accident after it received a CRN, and once Geico paid, Alpizar would be forced to "blame everything on" the March Accident in order to "get the $1.7 million plus, plus all the interest that's been running, . . . and attorney's fees of over $600,000.00" ("**Alpizar Note**"). (*See id.* at 14, 18.) Geico argued that the Alpizar Note established that Alpizar knew Batchelor's back injuries were caused by the October Accident, but intended to argue otherwise in order to "maximize the recovery" from Geico. Accordingly, Geico argued that Batchelor rejected the 2007 Tender "to get more" than she was "entitled to recover under" the Policy. (*See id.* at 16.)

Finally, Geico urged the jury to: (1) credit the testimony of Geico employees, who had no reason to testify falsely and just "go to work for Geico and try to do their best to handle these claims;" and (2) discredit Alpizar and Batchelor—who had a great financial interest in the outcome of the case. (*See id.* at 18–21.) Finally, Geico advised the jury that it could not find bad faith if it determined that "the adjustors who actually handled" Batchelor's UM Claim—Maldonado, Thagard, and DeKalb—"honeslty" believed, "based on what they had in front of them" that, after the March Accident, Batchelor only "had a temporary injury" that was improving with Pilates, and any permanent injury resulted from

the October Accident. (*See id.*) After a brief deliberation, the jury returned its Verdict for Geico. (Doc. 177.)

### III.   **Post-Trial Briefing**

Contending that the Trial was an "unfair and futile exercise in seeking justice," Batchelor timely moved for a new trial or to vacate the Judgment and enter default against Geico as a sanction for litigation misconduct. (*See* Doc. S-220 ("**New Trial Motion**"); *see also See* Doc. S-218 ("**Sanctions Motion**").) According to Batchelor, the extraordinary relief she requests is warranted because: (1) Geico purposefully elicited perjurious testimony from Formella that was crucial to Geico's defense of the Bad Faith Claim; and (2) Batchelor suffered substantial prejudice because Geico asserted ACCP before Trial to deprive her of evidence essential to her Bad Faith Claim—including documents that revealed Formella's perjury.[34] (*See* Doc. S-218; *see also* Doc. S-194 (transcript of Formella's testimony); Doc. 200 (transcript of Batchelor's Motion for Mistrial).)

Geico counters that Batchelor's arguments are foreclosed by her counsels' decision at Trial to forego cross-examination and have the Court strike Formella's testimony. (*See* Doc. S-237.) Without addressing the Court's Waiver Decision, Geico also argues that: (1) Batchelor "waived any argument that the materials at issue are not protected" by ACCP; and (2) Geico's success in asserting ACCP pre-trial somehow bars further consideration of ACCP issues.[35] (*See* Doc. S-237, pp. 8–11.) Contradicting representations that Geico made to the Court before Trial to avoid *in camera* inspection

---

[34] For instance, Batchelor contends that productive questioning of the Geico employees who handled Batchelor's UM Claim was impossible because Geico withheld the ACCP materials from them as well as Batchelor. (*See* Doc. S-220.)

[35] These arguments conveniently ignore that Geico's waiver of ACCP was not raised before trial.

of the Formella Documents under *Genovese* (*see* Doc. 84, pp. 10–11)—Geico also contends that Formella proposed a **$20,000.00** PFS to Geico "*for business or risk management reasons* unrelated to his assessment of the true value" of the UM Claim.[36] (*See id.* at 5 (emphasis added).) Describing its own litigation conduct as "at all times ethical and proper," Geico argues that Batchelor should be sanctioned for raising arguments that are "barely comprehensible, misleading, frivolous, scurrilous, [and] utterly without merit."[37] (See Doc. S-233, p. 19; Doc. S-237, p. 2.)

## LEGAL STANDARDS

### I.    Federal Rules of Civil Procedure 59 & 60

Under Rule 60(b)(3), courts may vacate a judgment based on "clear and convincing evidence" that "fraud, misrepresentation, or misconduct" prevented the moving party from fully and fairly presenting her case to the jury.[38] *See Olem Shoe Corp. v. Wash. Shoe Corp.*, 591 F. App'x 873, 886–87 (11th Cir. 2015); *Hollybrook Cottonseed Processing, LLC v. Am. Guar. & Liab. Ins. Co.*, 772 F.3d 1031, 1034 (5th Cir. 2014)

---

[36] Batchelor argues that Formella's testimony that he agreed with Geico's decisions to submit the First and Second PFS for **$2,500.00** was perjurious as evidenced by the Formella Report—which established that a year earlier he advised Geico to offer Batchelor **$20,000.00**—and Formella's testimony that the absence of a permanent injury meant Batchelor could recover only about **$1,700.00** for OPME at a trial was also perjurious as evidenced by a note in the Formella Report that Batchelor's OPME were **$2,768.00**. (*See* Doc. S-220.)

[37] Geico also moved separately to strike Batchelor's Post-Trial Motions (Doc. S-234), which the Court denied. (Doc. S-248.)

[38] The authority conferred by Rule 60(b)(3) is distinct from the authority to "set aside" any "judgment for fraud on the court" (Fed. R. Civ. P. 60(d)(3)) based on clear and convincing evidence of "more egregious forms of subversion of the legal process." *See S.E.C. v. Lauer*, No. 13-13110, 2015 WL 1782022, at *6 (11th Cir. Apr. 21, 2015); *Smith v. Phillips Winters Apartments*, 599 F. App'x 365, 366 (11th Cir. 2015); *see also Matthews, Wilson & Matthews, Inc. v. Capital City Bank*, No. 14-13565, 2015 WL 3451760, at *2 (11th Cir. June 1, 2015).

(affirming grant of new trial where the "totality of the circumstances" provided "no fair assurance" that the "jury was not influenced by the inadmissible settlement testimony").

Under Rule 59(a)(1)(A), courts may order a new trial if a litigant's "substantial rights" are adversely impacted by defects in the trial—including presentation of prejudicial information, misconduct or pernicious behavior, erroneous jury instructions, or some combination of the foregoing. *See Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*, 37 F.3d 1460, 1465 (11th Cir. 1994); *see also* Fed. R. Civ. P. 61 (requiring courts to "disregard all errors and defects that do not affect any party's substantial rights"); *FIGA v. R.V.M.P. Corp.*, 874 F.2d 1528, 1532 (11th Cir. 1989) (reversing judgment and ordering new trial where evidentiary error could have affected the outcome of the case).

District courts are afforded considerable discretion in these post-trial motions because the trial judge is in the best position "to measure the effect" on the jury of "an improper question" and prejudicial events. *See O'Rear v. Fruehauf Corp.*, 554 F.2d 1304, 1308 (5th Cir. 1977).[39] Various factors are pertinent to a reasoned exercise of the court's discretion, including "the number of errors, the closeness of the factual dispute, the prejudicial effect [of the error or defect], the [jury] instructions given" and whether counsel "intentionally caused" the error or defect or "focused" on the defect "during the trial."[40]

---

[39] The decisions of the U.S. Court of Appeals for the Fifth Circuit, which that court handed down "prior to the close of business" on September 30, 1981, are "binding as precedent in the Eleventh Circuit." *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

[40] *See Wilkinson v. Carnival Cruise Lines, Inc.*, 920 F.2d 1560, 1568 n. 18 (11th Cir. 1991) (holding that new trial was required despite trial court's curative instruction); *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1337 (5th Cir. 1978); *Tierney v. Black Bros. Co.*, 852 F. Supp. 994, 1004 (M.D. Fla. 1994) (granting conditional new trial based on "misconduct of trial counsel").

*See Ad-Vantage*, 37 F.3d at 1465; *Aetna Cas. & Sur. Co. v. Gosdin*, 803 F.3d 1153, 1160

(11th Cir. 1986) (finding new trial was required based on analysis of factors).

## II.    Bad Faith Claims and Privileges

By enacting § 624.155, the Florida legislature codified the common law concerning

insurers' good faith obligations to third-party insureds[41] and extended that law by creating

a new claim that subjects insurers to liability for failing to act in good faith toward their

first-party insureds—insureds who seeks benefits for a covered loss suffered directly by

the insured. *See Ruiz*, 899 So. 2d at 1126. Statutory bad faith claims generally involve

fact-intensive disputes that are resolved by jurors who assess the entirety of an insurer's

conduct under a "totality of the circumstances" standard ("**Totality Standard**"). *See*

*Dadeland Depot*, 483 F.3d at 1279 (affirming judgment for insured based on the Totality

Standard" and noting that each bad faith case must be determined on its own facts—

usually by a jury).[42]

---

[41] A third-party insured faces prospective liability to a third party for a loss that the insured claims is covered by his policy. *See Ruiz*, 899 So. 2d at 1126. When faced with a third-party claim, insurers must act in good faith by refraining "from acting solely on the basis of their own interests" rather than those of the insured. *Id.* Insurers who do not act in good faith may be held liable for damages caused to their insureds—including any verdict in excess of the limits of a policy. *See Dadeland Depot, Inc. v. St. Paul Fire & Marine Ins. Co.*, 483 F.3d 1265, 1276 (11th Cir. 2007).

[42] *See also State Farm Mut. Auto. Ins. Co. v. Laforet*, 658 So. 2d 55, 62–63 (Fla. 1995) (rejecting "fairly debatable" standard and noting five factors that may be pertinent to the "totality-of-the-circumstances"); *Jaimes v. GEICO Gen. Ins. Co.*, 534 F. App'x 860, 866 (11th Cir. 2013) (affirming judgment for insured based on the "totality of the circumstances standard"). Although mere negligence is insufficient to establish a violation of § 624.155, under the Totality Standard, the factfinder should consider whether an insurer used "reasonable diligence and ordinary care" in handling the claim for benefits. *See Campbell v. Gov't Emps. Ins. Co.*, 306 So. 2d 525, 530–31 (Fla. 1974).

Attorneys are ubiquitous in the insurance industry, and they are unavoidable once a claim for benefits under an insurance policy lands in court. Given such prevalence and the expansiveness of the Totality Standard, insurance coverage and statutory bad faith claims have provided fertile grounds for ACCP and WPP disputes in state and federal courts.[43] *See Genovese*, 74 So. 3d 1067 (noting that issues "regarding the discovery" of WPP and ACCP arise in bad faith claims because success on a coverage claim is a prerequisite to a bad faith claim and success on the bad faith claim turns on evidence in the insurer's claim files). Indeed, the Florida Supreme Court held that WPP is "discoverable" in bad faith claims because such materials are "'necessary to advance [a first-party bad faith] action . . . [and] evaluate the allegations of bad faith.'"[44] *See id.* (quoting *Ruiz*, 899 So. 2d at 1128–29).

Under Florida law, the ACCP affords an attorney's client the "privilege to refuse to disclose, and to prevent other person[s] from disclosing, the contents of confidential communications when such other person learned of the communications because they were made in the rendition of legal services to the client[s]."[45] Fla. Stat. § 90.502(2).

---

[43] *E.g. Allstate Ins. Co. v. Levesque*, 263 F.R.D. 663, 667 (M.D. Fla. 2010); *Bradfield v. Mid-Continent Cas. Co.*, 15 F.Supp.3d 1253, 1255–56 (M.D. Fla. 2014) (rejecting assertions of ACCP and the mediation privilege and ordering production of withheld documents so that opposing party could "effectively challenge" the settling parties' good faith and the reasonableness of a *Coblentz* agreement).

[44] Because the Bad Faith Claim is founded on a Florida statute, and this Court's jurisdiction over the claim based on diversity, federal law controls WPP issues and Florida law controls ACCP issues. *See* Fed. R. Civ. P. 501.

[45] Persons and entities are "clients" if a lawyer renders legal services to them or they consult "with a lawyer with the purpose of obtaining legal services." Fla. Stat. § 90.502(1)(b). A communication is "confidential" if it is between a lawyer and his client, and it is disclosed only to third persons who: (1) are reasonably necessary to transmit the communication; or (2) will further the rendition of legal services to the client as a result of the communication. *See id.* at § 90.502(1)(b).

Insurers who retain attorneys to defend them in coverage and bad faith litigation may assert ACCP as to communications regarding litigation, but not with respect to communications concerning claims-handling. *See Genovese*, 74 So. 3d at 1068; *see also Ruiz*, 899 So. 2d at 1129–30 (directing courts to "conduct an in-camera inspection" when an insurer asserts the ACCP in a bad faith action to determine whether the attorney was investigating the claim or rendering legal advice).

ACCP conflicts with the public policy in favor of full and complete disclosure in litigation, and it is to be narrowly construed—particularly when it is asserted by corporate entities. Further—a client may voluntarily waive ACCP expressly or by implication by voluntarily disclosing or consenting to disclosure of the privileged matter or a "significant part" thereof. *See* Fla. Stat., § 90.502(2); Fed. R. Evid. 502(a); *see also GAB Bus. Serv., Inc. v. Syndicate 627*, 809 F.2d 755, 762 (11th Cir. 1987). The party asserting ACCP must establish its applicability—including that the privilege was not waived. *S. Bell Tel. & Tel. Co. v. Deason*, 632 So. 2d 1377, 1383 (Fla. 1994).

## DISCUSSION

The evidence before the Court is not sufficient to find by clear and convincing evidence that Formella's testimony was perjurious;[46] however, the record does clearly and convincingly establish that Batchelor's substantial rights were prejudiced, and she was prevented from fairly and fully presenting her case, due to Geico's improper use of the ACCP.

---

[46] The falsity of Formella's testimony does appear to be supported by a preponderance of the evidence. *See supra* note 36. At a minimum, the Formella Report and other materials withheld by Geico before trial provide ample cross-examination material which—effectively used—would persuade a reasonable jury to doubt Formella's credibility and discredit his testimony.

First, the Court reiterates its Waiver Decision, which is amply supported by the record and the applicable law. Importantly, the *Genovese* Court warned that an insurer who relies on "advice of its counsel as a defense" in a bad faith claim waives ACCP "under the 'at issue' doctrine" when a privileged communication is "necessary to establish the defense." *Genovese*, 74 So. 3d at 1069. This warning in *Genovese* is consistent with decisions from other courts fairly and consistently finding ACCP subject matter waivers when evidence that reveals a privileged communication is voluntarily presented in court.[47] *See Hyde Const. Co. v. Koehring Co.*, 455 F.2d 337, 342, 343 (5th Cir. 1972) (holding that a "client's offer of his own or his attorney's testimony as to a specific communication constitutes a waiver as to all communications on the same matter"); *Coates v. Akerman, Senterfitt & Eidson, P.A.*, 940 So. 2d 504, 511–12 (Fla. 2d DCA 2006) (noting that "if the client or attorney testifies as to privileged communications in part, this serves as a waiver as to the remainder of the privileged consultation or consultations concerning the same subject").

Here, Geico promised in its opening statement that Formella would provide testimony "to defend" Geico. (*See* Doc. 185, p. 18.) Geico fulfilled that promise when it called Formella as a defense witness and elicited testimony from him that was plainly intended to persuade the jury that Geico handled Batchelor's UM Claim in good faith. (*See* Doc. S-194, pp. 8–9.) Formella even mentioned a specific privileged communication—when Geico instructed him to make a settlement offer to Batchelor.

---

[47] Courts may imply a voluntary waiver of ACCP in myriad circumstances. *See generally*, Edward J. Imwinkelried, *The New Wigmore: Evidentiary Privileges*, § 6.12.4 (2015) (discussing cases where waiver was found because "At the Trial of a Lawsuit to Which the Holder [of a privilege] Calls as a Witness the Person Bound by the Privilege and Elicits the Witness's Testimony about the Content of a Confidential Communication").

(*See id.*) Geico also elicited expert opinion testimony from Atkinson, which Atkinson supported by referencing Formella's efforts in relation to the UM Claim. (*See* Doc. 211, pp. 92–93; *see also id.* at 64–65.) Geico's choices to present this testimony from Formella and Atkinson plainly constitutes the reliance on an advice of counsel defense that *Genovese* warned would operate as a waiver of ACCP.

Courts have often recognized that manifest unfairness occurs when an opposing party is deprived of privileged information after a selective disclosure of ACCP.[48] *See Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1419–20 (11th Cir. 1994) (quoting *Pitney-Bowes, Inc. v. Mestre*, 86 F.R.D. 444, 447 (S.D. Fla. 1980), *modified on other grounds*, 30 F. 3d 1347 (11th Cir. 1994). Further, where a party selectively discloses ACCP in court and after discovery is closed, a new evidentiary proceeding may be necessary to provide the opponent with a fair opportunity to use the entirety of the waived material. *See Official Cargo Transport Co. v. Certain Interested Underwriters at Lloyds of London*, 368 F. Supp. 2d 1314, 1316 (S.D. Fla. 2005). Here, a new trial is necessary so that Batchelor can present her Bad Faith Claim to a jury after a fair opportunity to review and use Geico's waived documents.

By necessity, proof of Batchelor's Bad Faith Claim depended on Geico's documentation of the UM Claim and the testimony of Geico employees concerning their actions. Both were lacking in this case—due in significant part to Geico's consistent and aggressive assertion of the ACCP. If Geico had timely and properly disclosed the waived

---

[48] *See also Baratta v. Homeland Housewares, LLC*, 242 F.R.D. 641, 643 (S.D. Fla. 2007) (finding waiver where a litigant asserts the ACCP in a manner that prejudices her "opponent's case" or for self-serving purposes); *Fed. Deposit Ins. Corp. v. Cherry, Bekaert & Holland*, 131 F.R.D. 596, 599 n.5 (M.D. Fla. 1990).

documents—particularly the redacted A-Log Notes—Batchelor could have conducted far more effective examinations of Geico's employees. Further, at a trial without redacted A-Log Notes, the jury will have a far better basis for deciding whether to fault Geico for omissions in the A-Log notes, which Geico employees testified might be attributable to the redactions.[49]

Batchelor also suffered plain prejudice with respect to Formella. Formella provided the primary testimony that Batchelor's permanent injuries were honestly and fairly attributed to the October Accident,[50] and he offered the only testimony concerning Geico's undocumented and somewhat inexplicable claims handling decisions in late 2007.[51] The Waived Documents provided ample material for impeachment and cross-examination, which may have enabled Batchelor to persuade the jury to: (1) doubt Formella's testimony that Geico fairly handled the UM Claim based on an honest belief that Batchelor's injuries were entirely attributable to the October Accident; and (2) conclude that Geico acted in bad faith when it offered Batchelor only $2,500.00 in the First and Second PFS and failed

---

[49] Before presenting Formella's testimony at Trial, Geico requested that the Court prohibit Batchelor from drawing any negative inferences from omissions in Geico's records that were due to its assertion of ACCP—particularly with respect to the redacted A-Log Notes. (*See* Doc. 223, pp. 23–24.) Geico argued that ACCP cannot "be used to prejudice [Geico] for asserting a valid right to withhold" privileged communications. (*Id.* at 23.) Batchelor responded that Geico asserted ACCP at its "own peril." (*Id.* at 24.) Due to Geico's successful arguments against *in camera* inspection before Trial, the Court was limited in its ability to assess these arguments. (*See id.* at 25.) Nonetheless, the Court agreed that it would be inappropriate to "suggest some sinister motive" to the jury based on assertion of the ACCP. (*Id.*) Geico's selective waiver of ACCP dramatically changed the landscape for these arguments.

[50] Maldonado and Thagard could not offer such testimony because they ceased working on the UM Claim before the October Accident, and the examiner who did work on the UM Claim during the pertinent time—Small—could remember almost nothing.

[51] None of the Geico employees who testified at Trial would take responsibility for authorizing the First and Second PFS or the 2007 Tender.

to timely tender UM Limits. Without cross-examination, Geico was able to argue in closing that these events were innocuous, if not consistent with good faith.

Given the unique circumstances of Geico's selective disclosure on the final day of trial, and the volume of documents previously withheld, the Court's offer to require production of the waived documents and to permit cross-examination of Formella at a later date was not a viable remedy for Batchelor, and her counsel cannot be faulted for declining that option. Further, the Court cannot conclude that the substantial prejudice suffered by Batchelor was adequately ameliorated by the Court's brief and sterile instruction that the jury disregard Formella's unchallenged testimony. *See Wilkinson*, 920 F.2d at 1568 n. 18.

The evidence that Geico handled the UM Claim in compliance with the good faith standards set forth in §624.155(b)(1)(b) was not strong, and the jury heard significant evidence that would support a finding of bad faith. Due to the closeness of the evidence, the jury could easily have reached a different result if Geico had not improperly used the ACCP as a shield to hide evidence before trial and as a sword to establish its purported good faith at trial. Accordingly, the Court must exercise its discretion to order a retrial. *See Ad-Vantage*, 37 F.3d at 1465; *see also Tierney*, 852 F. Supp. at 1004.

## CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED**:

1.     Plaintiff's Motion for New Trial (Doc. S-220) is **GRANTED**.

2.     Plaintiff's Motion to Vacate Judgment and for Sanctions (Doc. S-218) is **GRANTED** to the extent that Plaintiff requests that the Court vacate the Judgment and it is otherwise **DENIED**.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on October 22, 2015.



ROY B. DALTON JR.
United States District Judge

Copies:

Counsel of Record